# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORHTERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| AUTOSCRIBE CORPORATION | § | |
| | § | |
| Plaintiff | § | Case No. 1:24-cv-04282-SCJ |
| | § | |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| M&A VENTURES, LLC | § | |
| | § | |
| Defendant. | § | |
| | § | |

## PLAINTIFF AUTOSCRIBE CORPORATION'S
## RESPONSIVE CLAIM CONSTRUCTION BRIEF

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ......................................................................................1

II.    ARGUMENT.............................................................................................2

A.  "perform[ing] each software process required to maintain compliance with one or more information security standards" is not indefinite, and M&A attempts to improperly narrow the plain language of the '621 Patent..........................................................................................................2

B.  The term "sensitive financial account information" is not indefinite; its meaning is clear from the face of the '621 Patent..............................................6

C.  The prosecution history makes it clear that "obtain[ing]" and "forward[ing]" a payment amount includes money being transferred from a financial institution to the merchant..............................................................7

D.  M&A improperly narrows "authenticate[s] a payee" / "authenticating the payee" despite the plain language of the '621 Patent...............................11

E.  M&A again attempts to inappropriately narrow the '621 Patent by manufacturing limitations for the claim term "function" that do not exist within the patent. ........................................................................................13

F.  M&A's attempted broadening of the claim language "providing a non-sensitive electronic data token . . . to the merchant . . . without providing the non-sensitive data token to the payer" goes against the very purpose of the '621 Patent.........................................................................................15

    1)    M&A's proposed addition of the phrase "during the token retrieval function" is inconsistent with the prosecution history of the '621 Patent. ........................................................................................15

    2)    M&A's argument based on the claim language—that the "without providing the [token] to the payer" limitation is "specifically delineated in the claim" as part of the token retrieval function—is inconsistent with other claim limitations. ........................................................................18

G.  M&A's proposed construction of "receiving the non-sensitive electronic data token from the secure server, wherein . . . the secure server does not provide the non-sensitive electronic data token to the payer" is improper. .......................................................................................................19

H.  M&A attempts to write in limitations to "generating a uniform resource locator (url), . . . the url comprising either: a dynamic url

generated by the secure serve . . .; or a static url and a hypertext transport protocol (http) parameter . . ." that do not exist in the '621 Patent. .............23

   I.   "representation of the non-sensitive electronic data token" is not indefinite. ................................................................................................26

**III.**   **CONCLUSION** .................................................................**31**

**CERTIFICATE OF SERVICE & COMPLIANCE** ............................................**33**

# I.  **INTRODUCTION**

In each of its proposed constructions, M&A strays from the plain language of the '621 Patent and the intrinsic evidence. M&A's motive is clear: to change the '621 Patent language in order to manufacture invalidity and non-infringement arguments. This is not proper claim construction; M&A's arguments are directly contradicted by the very language of the '621 Patent and the intrinsic record.

In its attempts to change the plain language of the '621 Patent, M&A relies heavily on the testimony of Dr. Michael Shamos. But "expert testimony may not be used to diverge significantly from the intrinsic record." *Genuine Enabling Tech. LLC v. Nintendo Co., Ltd.*, 29 F.4th 1365, 1373 (Fed. Cir. 2022). In fact, the Federal Circuit has repeatedly stated that "expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, and the prosecution history" should be discounted. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (quoting *Key Pharm. v. Hercon Lab'ys Corp.* 161 F.3d 709, 716 (Fed. Cir. 1998)). Dr. Shamos concedes as much. Shamos Decl., ¶ 22 (emphasis added) (stating he "understands that, in constructing a claim term, ***one looks primarily to the intrinsic patent evidence,*** including the words of the claims themselves, the remainder of the patent specification, and the prosecution history").

M&A's effort to substitute its expert's say-so for the intrinsic record should be critically examined. And, ultimately, Dr. Shamos's opinions must be disregarded

because the intrinsic record contradicts his conclusory opinions.[1] Instead, the Court should look to the plain meaning of the claim language, the specification, and the prosecution history. When the '621 Patent is examined in it is entirety, along with the prosecution history, M&A's indefiniteness positions and proposed constructions are unsupported and should be rejected.

## II.  ARGUMENT

**A.  "perform[ing] each software process required to maintain compliance with one or more information security standards" is not indefinite, and M&A attempts to improperly narrow the plain language of the '621 Patent.**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Not indefinite | Indefinite |

Largely depending on its expert's declaration, M&A argues this term is indefinite. Dkt. 139 at 4–6. The definiteness requirement of Section 112 represents a "delicate balance"—a patent must be precise enough to provide "clear notice of what is claimed," but the Supreme Court has acknowledged that "[s]ome modicum of uncertainty" is inevitable. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898,

---

[1] M&A argues that because Dr. Shamos has not been deposed, his conclusions are "the only evidence of how a POSITA would understand the '621 Patent," are "unrebutted," and thus must be adopted. *See* Dkt. 139 at 1, 4, 6. This argument, however, is unfounded. The intrinsic evidence contradicts his conclusions. And pointing those contradictions out with the specifications, claims, and public file history of the '621 Patent is, of course, one reason why responsive briefs are contemplated.

909 (2014). Accordingly, a sound claim construction "need not always purge every shred of ambiguity," so long as a person having ordinary skill in the art can determine what the patent claims with "reasonable certainty." *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1372 (Fed. Cir. 2016); *Nautilus*, 572 U.S. at 910.

Moreover, claim construction begins with "a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353 (Fed. Cir. 2017). Where a claim term is "readily understood" without construction, any "line drawing problems" are "properly left to the trier of fact." *Glob. Commc'ns, Inc. v. DirecTV, Inc.*, 2015 WL 12912449, at *7 (N.D. Fla. May 4, 2015) (quoting *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007)).

M&A argues that the term "information security standards" is indefinite because it is not specifically defined in the '621 Patent. Dkt. 139 at 5-6. But M&A ignores the language in the specification—and the prosecution history—that identifies PCI DSS as an example of an information security standard. *See* '621 Patent at 1:30-2:3, 5:65-6:4, 7:8-12, 10:51-57. In other words, the intrinsic record of the '621 Patent provides reasonable certainty as to the meaning of "information security standards" by identifying a well-known industry standard. It is not the case, as M&A implies, that the '621 Patent should have identified ***every single*** possible information and security standard to be definite. This would demand a level of

precision far beyond the requirements of definiteness and conflict with the longstanding principle that "well known industry standards need not be repeated in a patent." *Wellman, Inc. v. Eastman Chemical Co.*, 642 F.3d 1355, 1367 (Fed. Cir. 2011); *see also DirecTV, Inc.*, 2015 WL 12912449, at *7 ("[A] sound claim construction need not always purge every shred of ambiguity." "The resolution of some line-drawing problems" that remain is "properly left to the trier of fact.").

Indeed, "[i]t has long been the case that the patent need not disclose what a skilled artisan would already know." *Dow Chemical Co. v. Nova Chemicals Corp. (Canada)*, 809 F.3d 1223, 1225 (Fed. Cir. 2015); *see Wellman*, 642 F.3d at 1367. Even Dr. Shamos admits that a POSITA would have understood the PCI DSS standard to meet this "information security standards" term. *See* Shamos Decl., ¶ 53 ("A POSITA reading the '621 Patent and its prosecution history in 2012 **would have understood that PCI DSS was an 'information security standard**.'") (emphasis added). How can he, while providing a reasonably certain example of what would meet the claim term, also claim that the term is indefinite? The truth is, when Dr. Shamos reads the term in light of the specification, he cannot. *See* '621 Patent at 10:51–54 ("The secure server 202 or 'hosted system' preferably meets **acknowledged security standards**, *such as PCI compliance*, to safeguard the financial account information secured there.") (emphasis added).

Setting Dr. Shamos's feigned ignorance to the side, courts have routinely concluded that a skilled artisan would be well aware of industry standards without them being explicitly repeated in the patent. *See, e.g., American Innotek, Inc. v. United States*, 126 Fed. Cl. 468, 486 (Fed. Cl. 2016); *see also Wellman*, 642 F.3d at 1367 (finding a skilled artisan's awareness of an industry standard weighed against a finding of indefiniteness).

*American Innotek* is particularly instructive. There, the defendant contended that a POSITA "would not be able to determine the metes and bounds of the invention" for the claim term "prevent escape [of fluid]" because the intrinsic record did not specifically define how much leakage was permitted within the term's scope. *American Innotek*, 126 Fed. Cl. at 486. The court in *American Innotek* rejected this argument because the specification noted that the patent would be used for military use, which a skilled artisan would understand to require compliance with well-known Department of Defense standards. *Id.* The court further noted that any applicable standard need not be repeated in the patent itself. *Id.*

The '621 Patent makes clear the invention is for use in the payments industry. *See, e.g.*, '621 Patent at 1:24-62. And, going even further than the specification in *American Innotek*, the '621 Patent actually identifies an exemplary information security standard in the payments industry—the PCI DSS standard—which any

skilled artisan would be familiar with.[2] Accordingly, the Court should reject M&A's

indefiniteness argument, just as the courts did in *American Innotek* and *Wellman*.

**B.    The term "sensitive financial account information" is not indefinite; its meaning is clear from the face of the '621 Patent.**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Not indefinite; plain and Ordinary Meaning | Indefinite; alternatively, "financial account information whose storage requires compliance with one or more information security standards" |

M&A's argument that "sensitive financial account information" is indefinite

relies entirely on "information security standards" being found indefinite by the

Court. For the reasons outlined above, the Court should reject such a finding.

Moreover, M&A's alternative construction completely ignores the plain and

ordinary meaning of "sensitive" and the '621 Patent's specification in favor of its

expert's views. Dkt. 140 at 6, 8–9 (discussing both); Dkt. 139 at 7 (using Shamos

Declaration to support proposed construction). There is no reason to substitute Dr.

Shamos's definition of "sensitive" financial information for the plain meaning of

this term as it is described in the '621 Patent. *Phillips*, 415 F.3d at 1318. M&A's

construction should be rejected.

---

[2] M&A itself effectively concedes that this term is not indefinite by proposing it in one of its own proposed constructions. *Compare* Dkt. 139 at 4–6 *with id.* at 7. M&A cannot claim "information security standards" is indefinite while simultaneously proposing a construction that includes the term.

**C.    The prosecution history makes it clear that "obtain[ing]" and "forward[ing]" a payment amount includes money being transferred from a financial institution to the merchant.**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| "obtaining the payment amount and causing or requesting at least a portion of the payment amount to be sent, directed, or credited" | "obtain[ing] the money required for the [second] payment" /// "forward[ing] at least a portion of the money required for the [second] payment" |

M&A's proposed construction improperly reads "payment amount" to have two different meanings in the patent. *See* Dkt. 139 at 9–10. Specifically, M&A asks this Court to read "payment amount" to mean (1) the transaction value and (2) the actual money itself. But "payment amount" is used consistently throughout the '621 Patent to mean transaction value:

- "receives . . . at least one data element associated with the payer and a payment amount from the payor to the payee," '621 Patent at 16:65-67, 18:35-38; *see* 19:66-20:2, 21:14-17, 22:13-15;

- "specifying a second payment amount," *id.* at 17:62-63, 19:35-36;

- "obtaining the second payment amount," *id.* at 17:64-65, 19:37-38;

- "transmitting an electronic request requesting the payment amount from the financial account, obtaining the payment amount, and forwarding at least a portion of the payment amount to the payee," *id.* at 17:52-57, *see* 19:23-29, 19:41-42, 20:41-48, 21:56-64, 22:62-67.

Therefore, the claim language should be construed to be the same in each claim. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("Unless otherwise compelled, when different claims of a patent use the same language, we give that language the same effect in each claim.");

*Phonometric, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) ("[a]

word or phrase used consistently throughout a claim should be interpreted

consistently").

M&A's proposed interpretation of "payment amount" is also contradicted by

the prosecution history. Through the prosecution process, the claim language

changed in the following important ways:

(1) "storing the financial account information obtained from the payer; obtaining the ***amount of the payment*** from the payer by processing the payment using the financial account information obtained from the payer; and forwarding at least a portion of the ***amount of the payment*** to the payee," Dkt. 129 at Ex. C, ASC000033 (emphasis added).

(2) "storing the financial account information provided by the payer; processing the payment using the financial account information provided by the payer; processing the ***payment*** using the financial account information provided by the payer; and forwarding at least a portion of the ***payment*** to the payee," *id.* at ASC000108 (emphasis added).

(3) "processing the payment transaction using the sensitive financial account information by generating and transmitting an electronic request requesting the ***payment amount*** from the financial account, obtaining the ***payment amount***, and forwarding at least a portion of the ***payment amount*** to the payee," '621 Patent at 17:52-57.

Notably, the change in language across time in the prosecution history demonstrates

that the intent was for payment amount to mean transaction value, as "payment" or

money paid was specifically rejected. *See Phillips*, 415 F.3d at 1317 ("Like the

specification, the prosecution history provides evidence of how the PTO and the

inventor understood the patent . . . the prosecution history can often inform the

meaning of the claim language by demonstrating how the inventor understood the invention").

M&A also turns a blind eye to the comments in the prosecution history surrounding the insertion of the "obtaining" and "forwarding" language. Importantly, the language was inserted to specifically refer to the electronic request "from the secure server to the ***entity that causes the payment amount to be transferred***" Dkt. 139 at Ex. C, ASC000527 (emphasis added).[3] Under this understanding, it is clear that the "electronic request" language used in Claim 1 includes the request from the secure server to an entity (such as a bank) that actually transfers to the money to the merchant. In other words, it is not the case that the secure server must actually take possession of the money and then transfer the money to the merchant.

M&A's proposed construction also eliminates a preferred embodiment of the '621 Patent. *See Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 2006 WL 6142860, at *4 (N.D. GA Sept. 18, 2006) ("Federal circuit precedent indicates that a proposed construction normally cannot stand if it fails to cover a preferred embodiment disclosed in the specification of the patent") (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("[a] claim construction that

---

[3] M&A's statement that "[t]here is nothing in the claim language, specification, or prosecution history to support" Autoscribe's construction is simply incorrect. Dkt. 139 at 12. M&A ignores this piece of the prosecution history.

excludes a preferred embodiment is 'rarely, if ever correct'"). Specifically, "Transactions processed may include, for example, credit card, **ACH**, and any other type of transaction processed using stored financial account information." '621 Patent at 10:58-60 (emphasis added). An ACH transfer is an "electronic transfer of funds from one bank account [(customer's account)] to another [(merchant's account)] over the ACH (Automated Clearing House) network." Ex. O at 3. Under M&A's proposed instruction, an ACH transfer would be construed-out of the '621 Patent because it requires that the money be first transferred to the secure server—as opposed to a bank-to-bank transfer through the Automated Clearing House.

Furthermore, M&A's proposed construction would incorrectly narrow the '621 Patent. The '621 Patent was designed to cover a situation where (1) the payment processor receives and disburses the money themselves and (2) the payment processor processes the payment but does not actually receive or disburse the money itself. By requiring the payment processor (here M&A) to actually receive the money, M&A's proposed construction narrows the '621 Patent to only cover the situation where the payment processor itself receives and disburses the money. Such a limiting construction should be rejected. *See Junk Food Custom Arcades, LLC v. Hit Box, LLC*, 2023 WL 11884772, at *7 (N.D. Ga. April 11, 2023) (refusing to narrow the claim language where no such limits existed in the claim language or specification) (citing *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323,

1343 (Fed. Cir. 2001) ("In this case, nothing in the claim or the specification directly or implicitly requires such a narrow construction")).

**D.   M&A improperly narrows "authenticate[s] a payee" / "authenticating the payee" despite the plain language of the '621 Patent.**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and Ordinary Meaning | "verify[ies] the identity of the payee/verifying the identity of the payee" |

M&A's proposed construction of "authenticat[ing]" as "verif[ying] the identity of" should be rejected because it is at direct odds with the '621 Patent. In Figure 4(f), step 578 ("Authenticates System User"), the system user is authenticated by determining whether the user has the proper *authority* to access the system as part of an authorized "organization, application, and user key registry." '621 Patent at 13:55-14:12. In this way, the embodiment shown in Figure 4(f) contemplates authentication as embracing authorization—not just identification. M&A's proposed construction is at odds with this embodiment because M&A's proposed construction is limited to "verifying the identity" and excludes "authorization" as outside the claim's scope. *See* Dkt. 139 at 15. M&A's proposed construction should therefore be rejected because it excludes the embodiment disclosed in Fig. 4(f). *See Nobel Biocare Servs. AG v. Instradent U.S., Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018) ("there is a strong presumption against a claim construction that excludes a disclosed embodiment").

The extrinsic evidence cited by M&A undermines its own position. Specifically, "authentication" is defined in the Wiley Electrical and Electronics Engineering Dictionary (2004) as "[i]n computers and communications, the process of verifying the *legitimacy* of a transmission, user, or system." *See* Dkt. 139 at 14. This definition provides that the scope of "authentication" includes verifying not just who a "user" is but also confirming their legitimacy. In other words, the definition is consistent with Fig. 4(f), which authenticates a user or an organization or an application by assessing its credentials. M&A, however, seeks to limit the scope of the construction of "authenticate" to verifying *only* the identity of a user (payee). This is improper and should be rejected. *See Texas Instruments, Inc. v. U.S. Intern. Trade Com'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("courts can neither broaden nor narrow claims to give the patentee something different than what he has set forth").

Next, M&A attempts to make a claim term differentiation argument based on the fact that the '621 Patent's specification includes the word "authorize." M&A's position is apparently that because the specification uses the word "authorize," the claim term "authenticate" must be narrowed such that it would not include authenticating a payee's *authority* to access the API. But even if claim term

differentiation *were* at play,[4] it would not preclude some overlap in meaning—only that "authenticate" not be entirely synonymous with "authorize." In short, the mere fact that the word "authorize" is used in the specification does not preclude the term "authenticate[s] a payee"/ "authenticating the payee" from including authenticating a payee's authority.

The Court should not narrow the scope of the term as M&A requests. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction"). Instead, the plain and ordinary meaning of the term should stand.

**E.    M&A again attempts to inappropriately narrow the '621 Patent by manufacturing limitations for the claim term "function" that do not exist within the patent.**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and Ordinary Meaning | "block of code that operates as a single logical unit" |

It is M&A's position that "function" should be construed as a "block of code that operates as a single logical unit." *See* Dkt. 139 at 16. M&A attempts to reach

---

[4] Although M&A contrasts "authenticate" with "authorize" and pitches this as a claim term differentiation argument, the claims do not use the word "authorize"— M&A's examples are from the specification. As such, M&A's citation to *Symantec* is inapplicable. *See Symantec Corp. v. Comput. Assocs. Int'l, Inc.*, 522 F.3d 1279, 1289 (Fed. Cir. 2008) ("when construing terms ***in the body of a claim***, the general assumption is that different terms have different meanings") (emphasis added).

this construction by contorting two different dictionary definitions into one. The Court should reject M&A's proposal for several reasons.

First, as described in Autoscribe's opening brief, the functions of the '621 Patent are defined in the claims themselves: (1) a financial account registration function and (2) a token retrieval function. *See* Dkt. 140 at 14-15. M&A even concedes this in its own briefing. *See* Dkt. 139 at 19.

Second, the primary definition of "function" in the Wiley Electrical and Electronics Engineering Dictionary is "[t]hat which a component, circuit, device, piece of equipment, or system **is intended to do**." Dkt. 139 at Ex. H at 306 (emphasis added). Ignoring the intrinsic evidence and its consistency with the primary extrinsic evidence, M&A jumps to the third definition in the dictionary, relying on that tertiary explanation to argue for its proposal.

But there is no intrinsic support for limiting the term "function" to a single strand of code, as opposed to the primary definition of the word being used to describe what specific portions of the system are designed to do or accomplish. "Function," as used within the '621 Patent, refers to the process of financial account registration as a whole and the process of token retrieval as a whole, because those are the "functions" the '621 Patent is designed to accomplish. *See Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1332-33 (Fed. Cir. 2001) (concluding that ordinarily, the meaning should align with the purpose of the patented invention).

Finally, as outlined in Autoscribe's opening brief, M&A's invalidity positions taken in the IPR and Invalidity Contentions undermine its claim construction position here. *See* Dkt. 140 at 16-17. M&A's attempt to redefine this term should be rejected.

**F.    M&A's attempted broadening of the claim language "providing a non-sensitive electronic data token . . . to the merchant . . . without providing the non-sensitive data token to the payer" goes against the very purpose of the '621 Patent.**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and Ordinary Meaning | "**during the token retrieval function**, provide a non-sensitive data token to the merchant **…** without providing the non-sensitive data token to the payer" (emphasis and ellipses added) |

M&A's proposal for this term actually broadens the claim scope by limiting the point at which the system may not provide "the non-sensitive data token to the payer," such that the prohibition exists only "during the token retrieval function." The effect of this is to change the entire scope of the '621 Patent (in a manner that is inconsistent with the prosecution history) and eviscerate its very purpose.

**1)    M&A's proposed addition of the phrase "during the token retrieval function" is inconsistent with the prosecution history of the '621 Patent.**

The "without providing the [token]" limitation has been in the claim language since early in the prosecution history, but the "token retrieval function" was not added until much later in the process. *Compare* Dkt. 139 at Ex. C, ASC000471 (an

examiner amendment dated February 22, 2023 adds the "token retrieval function" language to Claim 1) *with id.* at ASC000584 (including the "without providing the [token]" language as early as September 9, 2021). As can be seen from the prosecution history, the "token retrieval function" and the "providing . . . to the payer" term were each prosecuted separately and with no relationship to each other, showing that there is no underlying "during the token retrieval function" limitation to the "providing . . . to the payer" term.

Additionally, the similarly situated "without providing the financial account information" limitation was previously mentioned in the financial account registration function, but was removed because, as the prosecuting attorney pointed out, "it is already recited in the highlighted section below" (*i.e.*, under the "token retrieval function"). *Id.* at ASC000527. This further demonstrates that a POSITA would understand that such limitations were not intended to be constrained in time to the duration of the token retrieval function.

M&A also relies on the '482 provisional application to support its broadened construction, but attaches a different application—the more recent, published '424 application—instead. *See* Dkt. 139 at Ex. D. The '424 application does not contain the quoted language. Instead, like the '621 Patent, it specifies that the secure server "returns a token or other account identifier . . . to **merchant server** after the account information has been registered at secure server." *Id.* at 21. Nothing in the '424

application suggests that the token is ever provided to the payer. To the contrary, the '424 application repeatedly clarifies that it is ***not***. *See id.* at p.1, 12, 27 ("the second computing system does not provide the data token to the payer").

Although the '482 provisional application includes the phrase "returns a token or other account identifier to the user and/or the merchant's system," this is hardly something that amounts to a disclaimer, because it is not clear what "user" is being referred to. Ex. P at 21. On the same page as the quoted language, the payer is referred to as the "end user" and the merchant is referred to as an "authorized user." *Id.* At best, the language M&A relies on is ambiguous.[5] It is "inappropriate" to limit the definition of a claim term "based on prosecution history that is itself ambiguous." *Inverness Medical v. Warner Lambert Co.*, 309 F.3d 1373, 1382 (Fed. Cir. 2002).

Autoscribe further notes that M&A's prosecution history disclaimer argument is backwards. Disclaimer occurs when a patentee (Autoscribe) attempts to broaden its claim beyond something it gave up during prosecution. Here, M&A is attempting to broaden the scope of the claim terms beyond something Autoscribe gave up in prosecution, when it removed the language from the '424 application. Dkt. 139 at 20. This is backwards.

---

[5] Perhaps owing to that ambiguity, this language was subsequently removed and does not appear in the '424 application or the issued patent.

**2)  M&A's argument based on the claim language—that the "without providing the [token] to the payer" limitation is "specifically delineated in the claim" as part of the token retrieval function—is inconsistent with other claim limitations.**

One of the key purposes of '621 Patent is to allow merchants to process payments without bearing the security requirements and potential liability that come with gathering customers' sensitive financial account information. A claim construction argument that would gut this benefit must be viewed skeptically. But M&A's "delineation" argument does just that.

Specifically, one of M&A's main arguments in favor of their proposed construction is as follows:

> The claims then separately recite "executing a token retrieval function, upon initiation by the merchant server via the API" and then further includes the step of "providing a nonsensitive electronic data token … to the merchant … without providing the nonsensitive electronic data token to the payer…" *Id.* Thus, ***the claims specifically delineate*** providing the token "without providing the non-sensitive electronic data token to the payer" is performed during execution of the token retrieval function.

Dkt. 139 at 19 (emphasis added). But as Autoscribe pointed out in its own opening brief, this argument does not make sense if one looks at the language that M&A trims out with its ellipses:

> "providing a non-sensitive electronic data token representing the sensitive financial account information to the merchant server ***without providing the sensitive financial account information to the merchant server*** and without providing the non-sensitive electronic data token to the payer; and"

'621 Patent at 17:46-51 (emphasis added). If M&A's "delineation" argument holds up regarding the "non-sensitive electronic data token," then it would also apply to the similarly situated language regarding the "sensitive financial account information," such that outside of the token retrieval function, under M&A's proposal the sensitive financial account information could be shared freely. As Autoscribe explained in its opening brief (Dkt. 140 at 28–29), this would be a nonsensical result which would *fundamentally* (and wrongly) change the entire invention, would directly contradict what is taught by the specification, and would undermine a key purpose of the '621 Patent (which is to never provide the sensitive financial account information to the merchant).

For the above reasons, the Court should reject M&A's proposed construction because it improperly broadens the '621 Patent, goes against the plain and ordinary meaning, and is contrary to the prosecution history.

**G.    M&A's proposed construction of "receiving the non-sensitive electronic data token from the secure server, wherein . . . the secure server does not provide the non-sensitive electronic data token to the payer" is improper.**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and Ordinary Meaning | "**during the token retrieval function**, receiving a non-sensitive data token without the secure server providing the non-sensitive data token to the payer" (emphasis added) |

This term is similar to the previous term (though it is from the merchant server's perspective, rather than from the secure server's perspective), and M&A

proposes to add the same "during execution of the token retrieval function" limitation to this term as well. As such, the arguments above apply here too.

M&A does raise one additional argument for this claim term, but it is based on a misunderstanding of the prosecution history. M&A compares Claim 15's financial account registration function and token retrieval function and argues that:

> "the claims specify that the financial account information is not sent to the merchant server both during the financial account registration function and during the token retrieval function. In contrast, the claims only require 'the secure server does not provide the **non-sensitive electronic data token** to the payer' during the token retrieval function."

Dkt. 139 at 23 (emphasis added). Essentially, this is M&A's attempt to side-step the problem with its arguments on the previous term,[6] by arguing that because Claim 15 mentions the "without providing" limitation *twice* in reference to the financial account information, but only *once* in reference to the token, the "without providing" limitation must not be intended to apply to the token at all times (even if it is intended to apply to the "sensitive financial account information" at all times).

The reason M&A did not raise this argument for the previous term is apparent from a comparison of Claim 1 to Claim 15—Claim 1 does *not* state the "without providing the sensitive financial account information" limitation twice:

---

[6] *I.e.*, as discussed above, any temporal limitations added to the "without providing the [token] . . ." proscription must also apply to the "without providing the sensitive financial account information" proscription, which would eviscerate a key purpose of the '621 Patent.

| Claim 1 | Claim 15 |
|---|---|
| […]<br>outputting instructions to the payer computing system, in response to the HTTP request for the generated URL, to encrypt the sensitive financial account information provided by the payer and transmit the encrypted financial account information to the secure server via the secure socket layer connection;<br>[…]<br>providing a non-sensitive electronic data token representing the sensitive financial account information to the merchant server *without providing the sensitive financial account information to the merchant server* and without providing the non-sensitive electronic data token to the payer; and […] | […]<br>outputting instructions to the payer computing system to encrypt the sensitive financial account information provided by the payer and transmit the encrypted financial account information to the secure server, via the secure socket layer connection, *without providing the sensitive financial account information to the merchant server*;<br>[…]<br>receiving the non-sensitive electronic data token from the secure server, *wherein the merchant server does not receive the sensitive financial account information* represented by the non-sensitive electronic data token and the secure server does not provide the non-sensitive electronic data token to the payer;<br>[…] |

This creates a few problems with M&A's argument for this term in Claim 15. First, if M&A's argument is correct as to Claim 15, then it would imply that Claim 1 (by only including the "without providing" limitation in the token retrieval function but omitting it from the financial account registration function) permits "providing the sensitive financial account information to the merchant server," *so long as it did not happen during the token retrieval function*. But as discussed above with regard to the prior term, this is a nonsensical result.

Second, M&A's position is inconsistent with the prosecution history. The discrepancy that forms the basis of M&A's argument arose in an examiner

amendment to the claim language at the end of the prosecution history. *See* Dkt. 139 at Ex. C, ASC000471–479 (February 28, 2023 amendment, striking this limitation from the proposed claim language that became the financial account registration function in Claim 1). It appears that this difference between the claims was unintentional—Claim 15 was supposed to have "mirrored claim language":



*Id.* at ASC000614 (January 12, 2023 email from the Examiner to prosecution counsel).

*Id.* at ASC0000643 (February 2, 2023 email from prosecution counsel to the Examiner, showing that claim 1 was prosecuted first before mirroring to other claims).

Third, interestingly, M&A asks the Court to reach the same construction of Claim 15 and 23, despite Claim 23 not containing the "without providing the sensitive financial account information to the merchant server" limitation contained in Claim 15. Instead, Claim 23 mirrors Claim 1, further supporting that Claim 15 should mirror Claim 1.

For the above reasons, and those stated in Section F, the Court should reject M&A's construction in favor of the plain and ordinary meaning: "without providing the nonsensitive data token to the payer" means not providing the nonsensitive data token to the payer.

**H.    M&A attempts to write in limitations to "generating a uniform resource locator (url), . . . the url comprising either: a dynamic url generated by the secure serve . . .; or a static url and a hypertext transport protocol (http) parameter . . ." that do not exist in the '621 Patent.**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and Ordinary Meaning | "**providing** a URL that **is** either: (1) a dynamic URL generated by secure server or (2) a static URL **known to the merchant** and a parameter" (emphasis added) |

M&A attempts to change the meaning of this claim term in three primary ways. First, M&A takes the position that the static URL must already exist and not

be generated. Second, M&A argues that the static URL must already be known by the merchant. Third, M&A substitutes "generating" out of the claim language for "providing." None of these alterations are supported by the plain language of the '621 Patent.

M&A argues the "static URL method never describes the secure server generating a new financial account registration URL," and it supports this argument by comparing Figure 4(d) (which it holds out as representative of the static URL option) to Figure 4(g) (which it holds out at representative of the dynamic URL option). M&A's point is apparently that Figure 4(g) includes step 430 ("creates registration URL"), but this step is missing from Figure 4(d), and therefore the static URL option (illustrated in Figure 4(d)) does not include "generating a new financial account registration URL." But this is not an apples-to-apples comparison. It is **Figure 4(b), not Figure 4(g)**, that illustrates the dynamic URL equivalent of the static URL embodiment illustrated in Figure 4(d). Because **Figure 4(b) also does not include the "creates registration URL" step**, M&A cannot use this comparison to support its argument.

Nothing in the claim language excludes the static URL from being "generated." Instead, the language of Claims 1, 8, and 25 do not specifically state whether the static URL is generated, previously created (*i.e.*, already known), or that either circumstance may apply—instead the '621 Patent uses a more general term

24

"used." *See, e.g.*, '621 Patent at 17:9-13. But the language of the '621 Patent demonstrates that the inventor knew when to limit the claim language where the inventor desired such a limitation. *See, e.g., id.* at 9-10 (requiring the dynamic URL to be limited to a circumstance where the dynamic URL is "generated"). Thus, the absence of "generated" in the static scenario should be understood to be broader than where the inventor used such limiting language. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("the resulting claim interpretation must, in the end, accord with the words chosen by the patentee to stake out the boundary of the claimed property"); *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) ("It is improper for a court to add 'extraneous' limitations to a claim, that is, limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim").

Similarly, the '482 application is entirely consistent with a static URL being "generated." In the section M&A intends to cite to,[7] a "Dynamic URL" workflow and a "Static URL" workflow are both described at a high level of generality. Ex. P at 62. Neither description makes any statement about whether the URL is generated, nor by whom. The "Dynamic URL" description mentions that the URL is "temporary"—because that is one of the unique characteristics of a dynamic URL.

---

[7] Once again, M&A mistakenly cites the '424 application, which does not include the quoted language. *See* Dkt. 139 at 26.

*See* Ex. Q at 4. But just like the patent, absolutely nothing in the application **precludes** generating the static URL at the secure server. At best, the application is ambiguous on this point, and an ambiguous prosecution history cannot overwrite the patent's plain language. *Inverness Medical*, 309 F.3d at 1382.

On M&A's second argument, there is no indication whatsoever in the '621 Patent that the static URL must already be "known to the merchant." Indeed, in its opening brief, M&A just simply writes in the language "known to the merchant" when describing the '621 Patent language with no citation or basis to write in such language. *See* Dkt. 139 at 25. M&A's argument relies on its assumption that the static URL cannot be generated, but as described above, that assumption is incorrect. Accordingly, the Court should reject's M&A's attempt to add the limitation that the static URL must be "known to the merchant."

Finally, as outlined in Autoscribe's opening brief, "providing" should not replace "generating" as M&A requests. After all, "generating" is a commonly understood term for which no construction is needed. *See Renishaw*, 158 F.3d at 1248. M&A provides no basis in its opening brief for why "generating" should be replaced with "providing."

I.     **"representation of the non-sensitive electronic data token" is not indefinite.**

| Plaintiff's Construction | Defendant's Construction |
| --- | --- |
| Not indefinite | Indefinite |

| Relevant Claim Language |
| --- |
| "a representation of the non-sensitive electronic data token" (claims 2, 9, 15, 23). |
| "wherein the representation of the non-sensitive electronic data token is the nonsensitive electronic data token" (claims 3, 10, 16). |

M&A pulls a sleight of hand in attempting to make a combined indefiniteness argument as to two different claim terms that never appear in the same claim. Essentially, M&A tries to get the Court to reach an indefiniteness conclusion for one claim and then extend that conclusion to language that appears in a different context in a completely different claim. The Court should reject doing so and instead view the plain language of the different claims separately, as Autoscribe does in its opening brief. *See* Dkt. 140 at 21-23.

M&A's indefiniteness argument relies on the premise that "a representation of the non-sensitive electronic data token" and "the representation of the non-sensitive data token is the nonsensitive electronic data token" are mutually exclusive. In other words, it is M&A's position that a representation must always "be different from the thing it represents." Dkt. 139 at 27. The plain language of the '621 Patent demonstrates M&A's premise is incorrect.

The language in the '621 Patent describes the various circumstances where a representation of the non-sensitive data token may be something else *or* the data token itself. As an example of when there may be something else representing the non-sensitive data token, the '621 Patent contemplates a situation where the payment

27

transaction instruction comes from a first computing system (the merchant) using a *representation* of the token (such as a payer ID, account number, or other representation of the purchaser) that is then transmitted to a second computing system (e.g., M&A) that has access to the sensitive financial account information. *See, e.g.,* '621 Patent at 8:52-59, 13:39-54.

On the other hand, the '621 Patent also contemplates the non-sensitive data token representing itself. For example:

> "In an example embodiment, to process a payment from the customer, **merchant server 204 submits the token** corresponding to the customer account to be debited and information specifying the amount of the payment **to the secure server 202**. The operator of the secure server 202 then processes the payment using the financial account pointed to by the token . . ."

'621 Patent at 9:12-19 (emphasis added). In this example, instead of the merchant transmitting a representation of the token (like a payer ID, account number, etc…), the merchant actually transmits the token.

At a high level, the '621 Patent is structured in the following manner:

- <u>Claim 1</u>: outlines a method by which the API is configured to require one or more data elements of the payer to be entered to process the transaction with the secure server. It requires this information because it is the first time the payer has purchased something from the merchant's webpage. A token is then created and connected to the payer while storing the payer's data elements on the secure server.

- <u>Claim 2</u>: mirrors Claim 1 except that it is a *second (or third, or fourth, etc.) payment transaction* and instead of requiring one or

28

more data elements of the payer be entered, it requires some sort of representation of the token tied to the payer, such as an ID number, customer number, etc… be transmitted by the merchant to the secure server.

- Claim 3: mirrors Claim 2 except that instead of a representation of the token potentially being something other than the token itself, it is the token itself that is transmitted by the merchant to the secure server.

In other words, when the '621 Patent is using the term "representation," it is talking about what is actually being transmitted to the secure server to trigger the payer's sensitive financial information. For Claim 1 it is data elements provided by the payer, for Claim 2 it is a representation of the token, and for Claim 3 it is the token itself. This makes sense because Claim 1 is focused on the first purchase made by a payer on the merchant's webpage, whereupon a token is created. Then Claims 2 and 3 focus on subsequent purchases by the same payer—who now has a token assigned to them—and the mechanism by which the merchant communicates a request to the secure server to access the token associated with the sensitive financial information of the payer. Under Claim 2, the merchant could decide to use a merchant-assigned representation of the token, such as "Smith123," and under Claim 3, the merchant decides to use the actual token.[8]

---

[8] Note, while the examples provided herein focus on the independent Claim 1 and dependent Claims 2 and 3, the same logic applies when reading the other independent and dependent claims. *See* Claims 8 (independent), 9 and 10 (dependent claims); Claims 15 (independent) and 16 (dependent); and Claim 23 (independent).

Said differently, the plain language makes it clear that "a representation of the non-sensitive electronic data token" and "wherein the representation of the non-sensitive electronic data token is the non-sensitive electronic data token" are not mutually exclusive. Rather, the plain language refers to alternatives available to the merchant during the transaction process to access the sensitive financial information stored on the secured server that is associated with a given payer.

This usage of "representation" accords with common sense and the ordinary meaning of the term. Self-representation is well-known and widely understood in the context of numbers and symbols. When "5" is written on this page, a representation of the number 5 has been written. But there is no doubt that *the number 5 itself* has also been written. *See* Ex. R. The former could be done without the latter, for instance by writing "2+3" or "⦀⦀". Similarly, when the merchant server sends a string of numbers, letters, or symbols to communicate the token to the secure server, it necessarily sends a representation of the token. When this string consists of the *unique* numbers, letters, and symbols that *are* the token, the merchant has sent a representation of the token that is the token itself.

The language of the '621 Patent, read in its entirety and taken together, allows for a POSITA to understand how to differentiate between a representation of a token and a token itself. *See ICU Medical, Inc. v. Alaris Medical Systems, Inc.*, 558 F.3d 1368, 1374 (Fed. Cir. 2009) ("the person of ordinary skill in the art is deemed to

read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification"); *Phillips*, 415 F.3d at 1315 (Claims do not stand alone but rather "are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims"). As outlined in Autoscribe's opening brief, significant additional intrinsic evidence supports a plain-language reading of the '621 Patent. *See* Dkt. 140 at 21-24.

Accordingly, M&A has failed to meet its high burden to demonstrate by clear and convincing evidence that this claim term is indefinite, and the Court should reject such a finding. *See Sonix Tec. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) ("Indefiniteness must be proven by clear and convincing evidence").

## III.   <u>CONCLUSION</u>

For the reasons set out herein, Autoscribe asks the Court to adopt its proposed claim constructions as set out above and in the Joint Claim Construction and Prehearing Statement (Dkt. 98).

Dated: January 24, 2025                    Respectfully submitted,

*/s/ Jason McManis*
Jason McManis
State Bar No.: 24088032
Colin Phillips
State Bar No.: 24105937
Chun Deng
State Bar No.: 24133178
Michael Killingsworth
State Bar No.: 24110089
Angela Peterson
State Bar No.: 24137111
Sean Healey
State Bar No.: 24142997
Ahmad, Zavitsanos & Mensing, PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
jmcmanis@azalaw.com
cphillips@azalaw.com
cdeng@azalaw.com
mkillingsworth@azalaw.com
apeterson@azalaw.com
shealey@azalaw.com

David S. Moreland
State Bar No.: 521998
Meunier Carlin & Curfman LLC
999 Peachtree St. NE, Ste. 1300
Atlanta, GA 30309
(404) 645-7700
(404) 645-7707 (fax)
dmoreland@mcciplaw.com

**Attorneys for Autoscribe Corporation**

## <u>CERTIFICATE OF SERVICE & COMPLIANCE</u>

The undersigned hereby certifies that on January 24, 2025, a copy of the foregoing and attachments thereto were served via the Court's ECF system on all counsel of record in this matter.

Pursuant to Local Rule 7.1(D), counsel for Plaintiff Autoscribe Corporation certifies that the foregoing was prepared in 14-point Times New Roman font and otherwise conforms to the requirements of Local Rule 5.1.

<u>*/s/ Jason McManis*</u>
Jason McManis