# THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

AUTOSCRIBE CORPORATION

    Plaintiff

v.

M&A VENTURES, LLC

    Defendant.

§
§
§
§
§
§
§
§
§

Case No. 1:24-cv-04282-SCJ

JURY TRIAL DEMANDED

## M&A VENTURES LLC'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I.    Introduction..................................................................................................1

II.   Argument ....................................................................................................2

A.   "perform[ing] each software process required to maintain compliance with one or more information security standards" ..................................................2

B.   "sensitive financial account information"...................................................5

C.   "obtainin[ing]" and "forward[ing]" a payment amount............................8

D.   "authenticate[s] a payee" / "authenticating the payee"...........................12

E.   "function" .................................................................................................15

F.   "providing a non-sensitive data token to the merchant…without providing the non-sensitive data token to the payer"...........................................................18

G.   "receiving the non-sensitive electronic data token from the secure server, wherein…the secure server does not provide the non-sensitive electronic data token to the payer"...............................................................................................18

H.   "generating a uniform resource locator (url),…the url comprising either: a dynamic url generated by the secure server…; or a static url and a hypertext transport protocol (http) parameter…"..............................................................20

I.    The "representation of the non-sensitive electronic data token" terms ..21

III.    Conclusion ......................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*,
  918 F.3d 928 (Fed. Cir. 2019) ..............................................................................7

*HZNP Medicines LLC v. Actavis Labs. UT, Inc.*,
  940 F.3d 680 (Fed. Cir. 2019) ............................................................................21

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014) ......................................................................3, 6

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)..............................................................................................2

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) ...........................................................15, 17, 21

## I.    INTRODUCTION

For many of the claim terms, Autoscribe proposes "plain and ordinary" meaning. However, Autoscribe's Opening Brief demonstrates that Autoscribe's version of "plain and ordinary" meaning differs significantly from what is disclosed in the patent specification and prosecution history. Autoscribe attempts to broaden its claims under the guise of plain and ordinary meaning while citing to nebulous statements in the prosecution history in support of its expansive reading. M&A's proposed constructions are consistent with how a POSITA would read and understand the specification and prosecution history. Construction of these terms is necessary where the parties dispute how a POSITA would understand a term.

Tellingly, Autoscribe only proposes construction of a single claim element: forwarding at least a portion of the payment amount. Autoscribe proposes this construction because, without it, they cannot plausibly pursue infringement claims against M&A. The proposal put forth by Autoscribe is a clear attempt to impermissibly broaden the claims beyond what the inventor contemplated. Autoscribe supports this construction with a misread of a single comment made by prosecution counsel during amendment of a different claim term.

Autoscribe also cannot escape the indefiniteness of certain claims by arguing that the claims are simple and straightforward. Autoscribe lists paragraphs of quotes from the specification, but never explains how those are relevant or require adoption

of Autoscribe's constructions. The only evidence in the record from a POSITA is that several claims cannot be understood with reasonable certainty, which requires a finding of indefiniteness.

## II.    ARGUMENT

### A.    "perform[ing] each software process required to maintain compliance with one or more information security standards"

| Claim Term (1, 8, 25) | Autoscribe's Proposal | M&A's Proposal |
|---|---|---|
| "perform[ing] each software process required to maintain compliance with one or more information security standards" | Not indefinite | Indefinite |

A POSITA would not understand the scope of the claim term "information security standards" with reasonable certainty and therefore, claims 1, 8, and 25 are indefinite.   Importantly, "reasonable certainty" is the governing standard for indefiniteness set forth in the U.S. Supreme Court's *Nautilus* decision, which overturned the "insolubly ambiguous" standard the Federal Circuit previously used. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014) ("In place of the "insolubly ambiguous" standard, we hold that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."). Autoscribe's argument that claims 1, 8, and 25

are not "insolubly ambiguous" incorrectly relies on case law that was overturned more than a decade ago and should therefore be disregarded.

The intrinsic record does not define "information security standards." Ex. B, Shamos Decl., ¶ 50.[1] While the '621 Patent identifies PCI DSS as an information security standard, simply identifying a single example is insufficient to comply with the statutory definiteness requirements. *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1373–74 (Fed. Cir. 2014) (citing *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1336 (Fed. Cir. 2010)). The '621 Patent does not provide any other guidance about what an information security standard is, and Autoscribe does not identify any in its Opening Brief.

While Autoscribe's Opening Brief copies and pastes six different portions of the specification, it does not provide any analysis of what those passages mean or how they show that this limitation is not indefinite. In fact, as M&A previously explained, one of those passages—which refers to "industry standards" and "best practices"—further muddies the waters by failing to explain how those sources of guidance differ from the claimed information security standards. '621 Patent at 1:59-62; Ex. B, Shamos Decl., ¶ 58. Four of the other excerpts merely mention PCI, the sole "information security standard" identified in the '621 Patent. '621 Patent at

---

[1] M&A cites to exhibits which were previously included with M&A's Opening Brief. Any new exhibit is labeled continuous with the previous labeling scheme.

1:63-2:3; 5:62-6:4; 7:8-12; 10:51-57. Notably, Autoscribe neither argues that the claims are limited to PCI nor provides a single other example of what an "information security standard" could be. And it does not refute or rebut the testimony of Dr. Shamos. The only evidence in the record is that a POSITA would understand "information security standards" is not limited to PCI DSS but would not understand what else would qualify. Accordingly, a POSITA would not understand this limitation with reasonable certainty, and it is indefinite.

That M&A proposed an alternative construction for "sensitive financial account information" incorporating the phrase "information security standards" does not undermine M&A's argument that "information security standards" is indefinite. M&A's indefiniteness argument for the "sensitive information" limitation is based on its argument that "information security standards" is indefinite. If the Court does not find that "information security standards" is indefinite, it can adopt M&A's alternative construction of "sensitive financial account information" instead.

**B.    "sensitive financial account information"**

| Claim Term (1, 8, 25) | Autoscribe's Proposal | M&A's Proposal |
|---|---|---|
| "sensitive financial account information" | Plain and ordinary meaning | Indefinite; alternatively, "financial account information whose storage requires compliance with one or more information security standards" |

### 1. "Sensitive financial account information" is indefinite.

As M&A explained in its Opening Brief, the '621 Patent distinguishes between (1) sensitive financial account information that requires compliance with heightened security measures called "information security standards" and (2) non-sensitive information that does not. '621 Patent, 2:35-39; *see also* 8:8-14 ("In a preferred embodiment, financial account information used to make one or more payments is submitted to the secure server while other less sensitive data elements such as customer's name and address are submitted to the merchant's regular server."). Because the '621 Patent does not adequately define "information security standards," a POSITA would not understand with reasonable certainty what information would qualify as sensitive financial account information.

Autoscribe's Opening Brief does not address the merits of M&A's indefiniteness argument, despite the fact that M&A disclosed its position in detail on August 2, 2024, when M&A served Autoscribe the declaration of Dr. Michael Shamos. Instead, Autoscribe merely argues—without citation to any evidence—that

a person of ordinary skill in the art would understand that full credit card numbers, full bank account numbers, and CVC codes are sensitive financial account information and therefore the term is not indefinite. Even assuming that Autoscribe's list does contain examples of sensitive financial account information, it is not enough that "a court can ascribe some meaning to a patent's claims." *Interval Licensing*, 766 F.3d at 1370–71 (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 911 (2014)). Dr. Shamos's testimony that a POSITA would not understand this limitation with reasonable certainty is the only evidence in the record about what a POSITA would understand and it should be credited.

### 2. Alternatively, the Court should construe "sensitive financial account information."

If the Court does not find that the terms "information security standards" and "sensitive information" are indefinite, it should adopt M&A's alternative construction. The '621 Patent and Autoscribe's own statements to the Patent Office to obtain that patent, demonstrate that the benefit of the '621 Patent is reducing the cost to the merchant of complying with information security standards. In arguing that the '621 Patent claimed patent eligible subject matter, Autoscribe said:

> "The claimed invention eliminates the need for merchant servers to receive, store, and transmit cardholder data by allowing those merchant servers to outsource the processing cardholder data to the secure server. As a result, the claimed invention eliminates the need for the merchant server to comply with the PCI Data Security Standard of Appendix A."

Ex. C at ASC000207. The '621 Patent claims this invention by "storing the sensitive financial account information in a secure storage location and performing each software process required to maintain compliance with one or more information security standards" "without providing the sensitive financial account information to the merchant server." '621 Patent, Claim 1.

In other words, the intrinsic evidence shows that the sensitive financial account information must be the information whose storage requires compliance with information security standards. Otherwise, the benefit of the invention is not obtained. Where the intrinsic record describes the benefit of the invention, such language can limit the claim scope. *Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) ("That construction is further supported by additional language in the specification, which explains the benefits of sublingual and buccal treatment over the prior art.")

Autoscribe's Opening Brief acknowledges that the '621 Patent correlates sensitive financial account information with the dangers of credit card fraud, but ignores the patent's related disclosure—that to prevent credit card fraud, certain information must be treated with higher security. In fact, the very sentence that Autoscribe cites to support its 'plain and ordinary meaning' of "information that could be used to perpetrate a fraud in case of a security breach" includes mention of higher security levels to prevent such fraud: "The second computing system, in this

example secure server 202, may typically be set up to provide a higher level of security than the merchant server in order to protect the sensitive financial account information that will be stored there, as such information could be used to perpetrate a fraud in case of a security breach." '621 Patent, 8:8-14.

**C.    "obtainin[ing]" and "forward[ing]" a payment amount**

| Claim Term (1, 2, 8, 9, 15, 23, 25) | Autoscribe's Proposal | M&A's Proposal |
|---|---|---|
| "obtain[ing] the [second] payment amount | | "obtain[ing] the money required for the [second] payment" |
| forward[ing] at least a portion of the [second] payment amount" | "obtaining the payment amount and causing or requesting at least a portion of the payment amount to be sent, directed, or credited" | "forward[ing] at least a portion of the money required for the [second] payment" |

The claims require that the secure server must obtain and forward a "payment amount." The parties dispute two aspects of the construction of these terms: (1) whether "payment amount" refers to information or funds and (2) whether "forwarding" a payment amount can include merely asking a third party to do so. The intrinsic evidence demonstrates that, as used in the limitation at issue, "payment amount" must mean funds. And there is no evidence to support a construction of "forwarding" that allows the secure server to merely request that money be sent, instead of sending the money itself.

### 1. Autoscribe's interpretation of the prosecution history is erroneous and its construction of "forwarding" should be rejected.

Autoscribe's **sole** source of evidence that "forwarding" "includes circumstances where the secure server makes a request to a third party to cause the dollars and cents to change hands" is based on a misunderstanding of prosecution counsel's comments made to the examiner during a claim amendment. (Aut. Op. Brief at 12.). It is important to understand both the amendment and the comment within their context. The original, as-filed claim of the '621 Patent read as follows:

> obtaining the amount of the payment from the payer by processing the payment using the financial account information obtained from the payer; and
>
> forwarding at least a portion of the amount of the payment to the payee.

Ex. C at ASC000033. It is clear from the original claim language that the amount of the payment was obtained by processing the payment. The secure server's API then forwarded a portion of the amount to the payee. The claim language was then amended several times with the final amendment as follows:

> processing the payment transaction using the sensitive financial account information ~~provided by the payer; and~~ by generating and transmitting an electronic request requesting the payment amount from the financial account, obtaining the payment amount, and forwarding at least a portion of the payment amount to the payee.

Id. at ASC000527. To overcome objections under § 101, Autoscribe amended the claims to better articulate the three steps that the API—which is provided by the secure server—performs to process the payment: (1) generating and transmitting an

electronic request requesting the payment amount; (2) obtaining the payment amount; and (3) forwarding at least a portion of the payment amount. *See* Ex. C at ASC000664. The comment identified by Autoscribe is transcribed below:

> "I called this request (from the secure server to the entity that causes the payment amount to be transferred) an 'electronic request' to differentiate it from the 'payment transaction instruction' (from the merchant server to the secure server) described in paragraph [0041] of the spec and recited in the merchant server claims."

*Id*. at ASC000527.

Prosecution counsel's comment is specifically addressing the first step of the payment process: generating and transmitting an electronic request requesting the payment amount. *Id.* For this reason alone, the comment is insufficient to support a rewriting of the third processing step: forwarding a portion of the payment amount to the merchant.

Further, the structure of the claim makes clear that the secure server must request the funds from the financial account, then obtain the funds, and then forward a portion of the funds to the merchant. Prosecution counsel's reference to "the entity that causes the payment amount to be transferred" is about the entity from whom the secure server must request the funds in the first place, i.e. the bank, ACH clearinghouse, etc. That comment has no bearing on who ultimately forwards funds to the merchant, which is the point the parties dispute here. The claim answers that question. The secure server's API forwards funds to the merchant. Nothing in the

intrinsic record supports Autoscribe's suggestion that a third party can forward funds, at the secure server's direction.

Autoscribe's proposed construction is an attempt to impermissibly broaden its claims to read on M&A's system. There is nothing otherwise in the entirety of the patent claims or specification to suggest that the inventor contemplated performance of the payment process by a third party. Representations during prosecution cannot enlarge the content of what the inventor has described as the invention. *See Biogen, Inc. v. Berlax Labs.*, Inc. 318 F.3d 1132, 1140 (Fed. Cir. 2003).

## 2. Autoscribe's proposed construction of "payment amount" leads to an absurd result.

Autoscribe argues that M&A's proposed construction which requires that "payment amount" be understood as actual cents and dollars renders the word "amount" void and out of the claim. For reasons which are articulated in M&A's Opening Brief, the term "payment amount" should be understood as the actual money required for payment. Autoscribe's proposed construction is broader and seems to include information about the amount to be paid within the meaning of the term "payment amount." However, this interpretation would lead to an absurd result for the forwarding element. In particular, the forwarding element requires "forward[ing] *at least a portion of* the [second] payment amount." Autoscribe's proposed construction is so broad as to encompass forwarding at least a portion of

11

the information about the amount to be paid. The specification does not explain how a portion of information could be forwarded and if so, why that would be useful.

Furthermore, Autoscribe's own proposed construction allows the "payment amount" to be "credited." This indicates Autoscribe's own understanding that the "payment amount" phrase, as recited in the obtaining and forwarding limitations, refers to funds not information. Autoscribe does not explain how the secure server could cause information to be "credited."

Autoscribe's proposed claim construction is based entirely on the misreading of a single comment made by counsel during prosecution of the patent. Autoscribe's proposed construction also leads to a nonsensical result. The Court should construe the claim terms consistent with M&A's proposed construction as it is consistent with the claim language, specification, and prosecution history.

**D.    "authenticate[s] a payee" / "authenticating the payee"**

| Claim Term (1, 8, 15, 23, 25) | Autoscribe's Proposal | M&A's Proposal |
|---|---|---|
| "authenticate[s] a payee"/ "authenticating the payee" | Plain and ordinary meaning | "verify[ies] the identity of the payee/verifying the identity of the payee" |

"Authentication" and "authorization" are two distinct concepts in the '621 Patent. As M&A detailed in its Opening Brief, the patent provides guidance for understanding the term "authenticate" and how the term is used in the context of the patent. A POSITA would understand that use of "authenticate" in the '621 Patent

refers to a verification of identity. This is consistent with M&A's proposed construction.

It is clear from Autoscribe's Infringement Contentions and Opening Brief that Autoscribe's plain and ordinary construction includes more than verifying identity. Autoscribe points to embodiments in the specification which it argues "include more than identity verification in the authentication process." (Aut. Opp. Brief. at 13). The first example Autoscribe points to is language within the specification providing a process for *authorization* of the user. '621 Patent, 10:46-50. Here, Autoscribe conflates ***authentication*** with ***authorization*** – the exact conflict that M&A's proposed construction seeks to avoid. The embodiment Autoscribe identifies discloses that knowledge of the token demonstrates that the user is authorized or permitted to use the financial account consistent with other uses of the term "authorization" within the patent. *See* '621 Patent, 2:64-3:3 ("The token is … used to identify the customer account to be debited to process a payment authorized by the customer."). This language in the specification, providing an embodiment for ***authorization*** *of the payer* is not helpful in illuminating the patentee's intent in claiming ***authentication*** *of the payee.*

The second example "embodiment" identified by Autoscribe discloses a payment gateway login function, step 578 of which "authenticates the system user." '621 Patent, 13:62-14:15. Only one sentence explains how this embodiment

authenticates a user: "During step 578 the system may access the organization application and user key registry at step 580." *Id.* Autoscribe does not explain why it contends this sentence undermines M&A's position, or the other evidence from the specification that demonstrates authentication and authorization are different processes.

Autoscribe further argues M&A's IPR is allegedly inconsistent with M&A's proposed construction. For the "authenticating a payee" element, M&A's IPR identifies a process by which the PayPal prior art reference verifies the identity of the merchant account holder, through a required username and password, in order to execute operation. Ex. E, *M&A Ventures v. Autoscribe*, IPR2024-01159, Paper 4 at 40. This is consistent with the patent specification's disclosure of authentication, what a POSITA would understand, and with M&A's proposed construction here.

Autoscribe points to M&A's citation to the PayPal reference which includes the term "authorize" in an attempt to sow confusion. PayPal's wording choice is not at issue here. The relevant question is how the '621 Patent uses the word "authenticate." The patent specification uses the terms authenticate and authorize to refer to different processes. Authentication, specifically, is used to describe the process of verifying identity. This is consistent with the understanding of the term in the art. *See* Ex. I, Dictionary of Computer Science (2016) at 32 ("Authentication. A process by which subjects, normally users, establish their identity to a system.

This may be effected by the use of a password or possession of a physical device, e.g., a coded token."). M&A's proposed construction is further consistent with this understanding and provides this clarity regarding the term "authentication." The parties dispute the scope of the asserted claims and the Court should resolve this issue prior to presentation before the jury. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-61 (Fed. Cir. 2008).

### E.    "function"

| Claim Term (1, 8, 15, 23, 25) | Autoscribe's Proposal | M&A's Proposal |
|---|---|---|
| "function" | Plain and ordinary meaning | "block of code that operates as a single logical unit" |

The term "function" has a distinct meaning in the context of software development and in the context of '621 Patent. Autoscribe cannot conveniently separate the use of the term from the context of the patent. This patent expressly discloses and claims processing a payment *by a computing system*. '621 Patent, Abstract. In the realm of computer programming, the term "function" has a distinct meaning which would be understood by a POSITA. *See* Ex. J, Dictionary of Computer and Internet Terms Vol. 1 (2016) at 217 ("function (n) ~ A piece of code that operates as a single logical unit.").

Autoscribe identifies use of the term "function" on three separate occasions in the prosecution history to support its argument that "function" is used in the

everyday sense rather than the code-specific sense. However, each of the so-called disclosures in the prosecution history identified by Autoscribe refer to performance of a function or functions in the context of the computer implemented technology where the term "function" is distinctly understood as a piece of code operating as a single logical unit. And none of excerpts from the prosecution history that Autoscribe cites contradict this understanding or discuss utilizing disparate portions of code to accomplish these function(s). Additionally, two of the three citations are to language not by the inventor directly but are instead language which is included in a Payment Card Industry (PCI) Data Security Standards reference, a 70 page document which was referenced by Autoscribe during prosecution. This use of "function" in the prosecution history would be understood by a POSITA as referring to blocks of code which are implemented by a computer, the same as a POSITA reading the specification history. Autoscribe cannot now seek to separate the term from the context in which it is used throughout the patent and prosecution history.

Autoscribe additionally contends that M&A's proposed construction would not make sense in the context of the specification because it would mean that blocks of code would be accessible to the merchant. Autoscribe intentionally obfuscates its reading of the specification. The patent discloses that the secure server provides the financial account registration function. '621 Patent at 5:57-61. Under M&A's construction, and in light of the specification, a POSITA would understand that the

function exists within the secure server as a block of code operating as a single logical unit which provides financial account registration to the merchant system.

Finally, Autoscribe argues M&A's IPR and Invalidity Contentions undermine M&A's claim construction position. M&A's Invalidity Contentions identified all possible invalidity positions as required by the local rules, including positions that reflect Autoscribe's apparent interpretation of the claims. *See* Ex. M, M&A's Invalidity Contentions at 3 ("In the absence of a claim construction order from the Court, Defendants have based these Invalidity Contentions upon their knowledge and understanding of the potential scope of the Asserted Claims at this time, and, in part, upon the apparent constructions of the Asserted Claims advanced by Autoscribe in its Preliminary Infringement Contentions."). Regarding M&A's IPR, M&A identifies functions, including the SetExpressCheckout and _ExpressCheckout functions which are contained within the financial account registration function. Similarly, the GetExpressCheckoutDetails and DoExpressChekoutPayment functions are contained within the token retrieval function. M&A's construction does not prevent functions which are nested within a larger function or block of code which operates as a single logical unit, but rather seeks to clarify that indiscriminate pieces of code throughout a server cannot be identified as satisfying a function limitation. The parties clearly have a dispute regarding the plain and ordinary

meaning of the term and therefore, construction is necessary. *See O2 Micro Int'l Ltd.,* 521 F.3d at 1360-61.

**F.    "providing a non-sensitive data token to the merchant…without providing the non-sensitive data token to the payer[2]"**

**G.    "receiving the non-sensitive electronic data token from the secure server, wherein…the secure server does not provide the non-sensitive electronic data token to the payer"**

| Claim Term (1, 8, 25) | Autoscribe's Proposal | M&A's Proposal |
|---|---|---|
| "providing a nonsensitive data token to the merchant… without providing the non-sensitive data token to the payer" | Plain and ordinary meaning | "during the token retrieval function, provide a non-sensitive data token to the merchant without providing the non-sensitive data token to the payer" |
| **Claim Term (15, 23)** | **Autoscribe's Proposal** | **M&A's Proposal** |
| "receiving the non-sensitive electronic data token from the secure server, wherein…the secure server does not provide the non- sensitive electronic data token to the payer" | Plain and ordinary meaning | "during the token retrieval function, receiving a non-sensitive data token without the secure server providing the non-sensitive data token to the payer" |

---

[2] Autoscribe's Opening Brief addresses these terms together. M&A responds here in kind.

Autoscribe's dispute with M&A's proposed construction can be distilled to the following: (1) M&A's proposed construction includes a temporal limitation which is not included for other similarly situated claim elements—namely "without providing the sensitive financial account information to the merchant server;" and (2) if the temporal limitation were included for that limitation, this would be inconsistent with the purpose of the invention.

M&A's Opening Brief clearly articulates why its proposed construction is necessary for these claim elements in light of the claim structure and disclosures in the specification. In particular, the claims recite separate functions—the financial account registration function and the token retrieval function. The limitations with respect to those functions define what does and does not happen during the execution of the function. M&A does not disagree  that the limitations disclosed within each function would be limited to that function. Whether these limitations also exist elsewhere or separately outside of a function is a different matter altogether.

M&A does not disagree that providing the sensitive financial account information to the merchant server at any point would be inconsistent with the purpose of the invention. This is the exact reason that a POSITA would separately understand that the financial account information is never provided to the merchant server even where the negative limitation is not expressly included. As Autoscribe points out, the patent specification includes express language indicating that the

19

purpose of the invention is to allow merchants to process data without transmitting, processing, or storing financial account data. '621 Patent, 5:62-65. Conversely, disclosing the non-sensitive data token to the payer during other steps in the process would not be inconsistent with the purpose of the invention or the disclosures. As previously articulated, the token is seemingly only meaningful to the merchant, and the specification never explicitly states that the token cannot be sent to the payer during any other step of the payment process. *See* '621 Patent, 10:46-48. Further, the '482 application, incorporated by reference in the patent, contemplates that the non-sensitive electronic data token is provided to the payer outside of execution of the total retrieval function. *See* Ex. D, '482 Application at 21. M&A's proposed construction is consistent with these disclosures and provides clarity on how the limitations would be understood based on the structure of the claim.

**H.    "generating a uniform resource locator (url),...the url comprising either: a dynamic url generated by the secure server...; or a static url and a hypertext transport protocol (http) parameter..."**

| Claim Term (1, 8, 25) | Autoscribe's Proposal | M&A's Proposal |
|---|---|---|
| "generating a uniform resource locator (url),... the url comprising either: a dynamic url generated by the secure server...; or a static url and a hypertext transport protocol (http) parameter..." | Plain and ordinary meaning | "providing a URL that is either: (1) a dynamic URL generated by secure server or (2) a static URL known to the merchant and a parameter" |

20

The claim language and the specification are clear in their disclosure that (1) the dynamic URL is generated by the secure server and (2) the static URL includes no such limitation. *See* Claim 1; *see also* '621 Patent 12:58-60. As stated in its Opening Brief, M&A's construction provides clarity to the jury that the static URL is not required to be generated by the secure server and more accurately provides that which is known to the merchant. M&A's construction achieves this clarity without any confusion regarding the dynamic URL which is still clearly *generated by the secure server* as separately recited for that limitation. Autoscribe's Opening Brief provides no disclosure in the patent which is inconsistent with M&A's proposed construction. Autoscribe fails to identify why M&A's proposed construction would be inconsistent with the plain and ordinary meaning of the term yet maintains its opposition to M&A's proposed construction. It can only be assumed that Autoscribe has a different understanding as to the plain and ordinary meaning. For this reason, the Court should resolve this issue prior to presentation before the jury. *See O2 Micro Int'l Ltd.,* 521 F.3d at 1360-61.

## I.    The "representation of the non-sensitive electronic data token" terms

| Claim Term (2, 9, 15, 23) | Autoscribe's Proposal | M&A's Proposal |
|---|---|---|
| "a representation of the non-sensitive electronic data token" | Plain and ordinary meaning | Indefinite |

| Claim Term (3, 10, 16) | Autoscribe's Proposal | M&A's Proposal |
|---|---|---|
| "wherein the representation of the non-sensitive electronic data token is the nonsensitive electronic data token" | Plain and ordinary meaning | Indefinite |

Where the intrinsic record is inconsistent about the meaning of a claim term, and therefore there is no clear construction available, the claim is indefinite. *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 698 (Fed. Cir. 2019). Here, a POSITA would recognize certain intrinsic evidence indicating that a representation must be different than the thing it represents ('621 Patent, 1:52-59; 3:9-15; 8:40-43; 10:46-48) and certain intrinsic evidence indicating that a representation is the thing it represents ('621 Patent, 8:52-9:11; Claims 3, 10, and 16). A POSITA would not understand how to reconcile this evidence. *See* Ex. B, Shamos Decl., ¶¶ 83-84. Therefore, Claims 2, 3, 9, 10, 15, 16, and 23 are indefinite.

Autoscribe's primary argument for these terms is that the '621 Patent adequately describes the use of tokens. Each of the eight excerpts Autoscribe cites from the specification merely describe the use of tokens in the claimed invention. None describe the use of a ***representation*** of the token, as required by Claims 2, 3, 9, 10, 15, 16, and 23. Autoscribe also cites to the dictionary definition of representation. As M&A explained in its Opening Brief, these claims are indefinite precisely because the definition of representation used in the specification—something that shows, describes, or represents something ***else*** (*See* Exs. K, L)—

22

cannot be reconciled with the language in Claims 3, 10, and 16 requiring the representation to be the thing it represents. None of Autoscribe's evidence helps explain this contradiction. And despite arguing that a representation in some claims can be a portrayal while in others must be the "best representation" of the thing itself, Autoscribe does not explain how to reconcile these arguments. In fact, Autoscribe's Opening Brief does not address M&A's indefiniteness argument at all, despite receiving Dr. Shamos's detailed explanation of that argument on August 2, 2024.

## III.    CONCLUSION

M&A's proposed constructions are consistent with the specification. And its indefiniteness arguments are supported by evidence from a POSITA. Autoscribe should not be permitted to rewrite claims under the guise of "plain and ordinary meaning." The Court should adopt M&A's positions as set forth herein.

Dated: January 24, 2025

*/s/ Stephanie N. Sivinski*

Richard Miller
Georgia Bar No. 065257
Alan White
Georgia Bar No. 410546
Ballard Spahr LLP
999 Peachtree Street NE, Suite 1600
Atlanta, Georgia 30062
Telephone: 678-420-9340
Email: millerrw@ballardspahr.com
　　　whiteda@ballardspahr.com

David H. Harper (*pro hac vice*)
Texas Bar No. 09025540
david.harper@haynesboone.com
Stephanie N. Sivinski (*pro hac vice*)
Texas Bar No. 24075080
stephanie.sivinski@haynesboone.com
Marron E. Frith (*pro hac vice*)
TX Bar No. 24137884
marron.frith@haynesboone.com
Jamie Raju (*pro hac vice*)
TX Bar No. 24095717
jamie.raju@haynesboone.com
HAYNES AND BOONE, LLP
2801 N. Harwood Street
Suite 2300
Dallas, Texas 75201
(214) 651-5000 (telephone)
(214) 200-0615 (fax)

**COUNSEL FOR DEFENDANT M&A VENTURES, LLC**

## **CERTIFICATE OF SERVICE**

I hereby certify that counsel of record was served this M&A Ventures LLC Responsive Claim Construction Brief via the Court's ECF system on January 24, 2025.

_/s/ Stephanie N. Sivinski_
Stephanie N. Sivinski


## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in 14-point Times New Roman font.

_/s/ Stephanie N. Sivinski_
Stephanie N. Sivinski