Trials@uspto.gov                                                    Paper 12
571-272-7822                                        Date: January 29, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

M&A VENTURES, LLC, REPAY HOLDINGS CORPORATION, and
REPAY HOLDINGS, LLC,
Petitioner,

v.

AUTOSCRIBE CORPORATION,
Patent Owner.

————————

IPR2024-01159
Patent 11,620,621 B2

————————

Before ST. JOHN COURTENAY III, MICHAEL R. ZECHER, and
KEVIN W. CHERRY, *Administrative Patent Judges*.

ZECHER, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*35 U.S.C. § 314*

EXHIBIT

A

IPR2024-01159
Patent 11,620,621 B2

# I.   INTRODUCTION

Petitioner, M&A Ventures, LLC, Repay Holdings Corporation, and Repay Holdings, LLC (collectively, "M&A Ventures"), filed a Petition requesting an *inter partes* review ("IPR") of claims 1–27 of U.S. Patent No. 11,620,621 B2 (Ex. 1001, "the '621 patent"). Paper 4 ("Pet."). Patent Owner, Autoscribe Corporation ("Autoscribe"), filed a Preliminary Response. Paper 10 ("Prelim. Resp."). Based on the authority delegated to us by the Director under 37 C.F.R. § 42.4(a), we may not institute an IPR unless the information presented in the Petition and any preliminary response thereto shows "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). Taking into account Autoscribe's Preliminary Response, we conclude that the information presented in the Petition does not establish that there is a reasonable likelihood that M&A Ventures would prevail in challenging any one of claims 1–27 of the '621 patent as unpatentable. We, therefore, *deny* M&A Ventures's Petition.

## A.  Real Parties in Interest ("RPIs")

The Petition identifies M&A Ventures, LLC, Repay Holdings Corporation, and Repay Holdings, LLC as RPIs. Pet. 104. Autoscribe identifies itself as an RPI. Paper 7, 1 (Autoscribe's Mandatory Notices).

## B.  Related Matters

The parties indicate that the '621 patent is the subject of a district court case titled *Autoscribe Corp. v. M&A Ventures, LLC*, No. 2:23-cv-00349-JRG (E.D. Tex. filed July 27, 2023) (originally filed as *Autoscribe Corp. v. Repay Holdings Corp. & Repay Holdings, LLC*). Paper 7, 1. The parties also indicate that the '621 patent is, or has been, asserted in a number

IPR2024-01159
Patent 11,620,621 B2

of other district court cases (Pet. 104, Paper 7, 1), including the following
pending cases identified by Autoscribe: (1) *Autoscribe Corp. v. Tsevo. LLC*,
No. 4:24-cv-03104 (S.D. Tex. filed Mar. 18, 2024); and (2) *Autoscribe
Corp. v. Nuvei Corp.*, No. 2:24-cv-00325-JRG (E.D. Tex. filed May 3, 2024)
(Paper 7, 1). Autoscribe also indicates that the '621 patent is being
challenged in another proceeding before the Board titled *Nuvei
Technologies, Inc. v. Autoscribe Corp.*, IPR2025-00089, Paper 1 (PTAB
Nov. 6, 2024) (Petition), which has not yet been instituted. Paper 11, 1
(Autoscribe's Updated Mandatory Notices).

### C. The '621 Patent

The '621 patent, titled "Enrolling a Payer by a Merchant Server
Operated by or for the Benefit of a Payee and Processing a Payment from
the Payer by a Secure Server," issued from U.S. Patent Application No.
16/535,424 ("the '424 application"), filed on August 8, 2019. Ex. 1001,
codes (54), (21), (22). The '621 patent is a continuation of U.S. Patent
Application No. 15/408,185, which issued as U.S. Patent No. 10,423,940
B2, which, in turn, is a continuation of U.S. Patent Application No.
13/679,545, which issued as U.S. Patent No. 9,576,279 B2 ("the '279
patent"). The '621 patent ultimately has a claim of priority to U.S.
Provisional Patent Application No. 61/655,482 ("the '482 application"),
which was filed on June 5, 2012. *Id.* at code (60).

The '621 patent generally relates to "systems and methods for
obtaining and using account information to process financial payments."
Ex. 1001, 1:18–20. The '621 patent states that, "[i]n the payments industry,
tokenization has become a popular means of bolstering the security of
electronic transactions while minimizing the complexity of compliance with

IPR2024-01159
Patent 11,620,621 B2

industry standards and best practices." *Id.* at 1:59–62. The '621 patent, however, states that "[t]here is need for improvement in conventional approaches to obtaining and using account information to process financial payments" due to the "limits in functionality of existing tokenization methods." *Id.* at 2:4–7.

The '621 patent purportedly addresses this need by establishing a "customer (payer) enrollment session," wherein the enrollment session is initiated by a merchant server where the customer provides information relevant to the enrollment session, but the session itself is completed on a secure server that may be different from the merchant server. Ex. 1001, 2:23–35. The secure server "stores the financial account information received from the customer" and "provides a token to the merchant's server." *Id.* at 2:51–54. The operator of the secure server may process the payment using the financial account pointed by the token and make the proceeds available to the merchant. *Id.* at 3:6–9.

IPR2024-01159
Patent 11,620,621 B2

Figure 3 of the '621 patent, reproduced below, illustrates "a method of registering customer financial information and processing payments" in accordance with one embodiment. Ex. 1001, 3:30–31.



FIG. 3

Figure 3 illustrates a "general method and process for enrolling a payer in an electronic system and then making a payment based on the enrollment." *Id.* at 7:50–54. The method begins at step 302 where "enrollment data identifying a payer" is stored in a first computing system. *Id.* at 7:53–55. At step 304, the first computing system (e.g., a merchant server) generates an "electronic instruction to a second computing system" to "obtain financial account information from the payer." *Id.* at 7:65–8:2. At step 306, this instruction is transmitted to the second computing system. *Id.* at 8:23–24. At step 308, the second computing system communicates with the payer, during which the payer can "provide the sensitive financial account

5

IPR2024-01159
Patent 11,620,621 B2

information to the second computing system without this information being visible . . . by the operator of the first computing system." *Id.* at 8:32–35.

Next, at step 310, the financial account information is stored in the second computing system and a token is generated for the referring payee (e.g., a merchant server). Ex. 1001, 8:37–40. The token is "a pointer that allows the payee to reference the financial account information of that payer without possessing the actual financial account information." *Id.* at 8:40–43. Then, at step 312, "the first computing system receives the token from the second computing system in response to its instruction to obtain financial account information for the payer." *Id.* at 8:43–66. According to the '621 patent, this "completes the registration of the payer so as to enable one or more intended payments to the payee using the stored financial account information." *Id.* at 8:49–51. At step 314, once registration is complete, "the payee can process an authorized payment from the payer by electronically generating a payment transaction instruction in the first computing system" and "electronically transmit[] the payment transaction instruction to a computing system other than the first computing system." *Id.* at 8:51–59.

### D. Challenged Claims

Of the challenged claims, claims 1, 8, 15, 23, and 25 are independent. Independent claim 1 is directed to "[a] method of processing a payment transaction from a payer to a payee, the method being performed by one or more secure servers," independent claim 8 is directed to "[a] secure server that processes a payment transaction from a payer to a payee," independent claim 15 is directed to "[a] method of enrolling a payer by a merchant server operated by or for the benefit of a payee," independent claim 23 is directed

6

IPR2024-01159
Patent 11,620,621 B2

to "[a] merchant server, operated by or for the benefit of a payee," and independent claim 25 is directed to "[a] method of processing a payment transaction from a payer to a payee, the method being performed by one or more secure servers." Ex. 1001, 16:53–55, 18:20–21, 19:60–62, 21:4–5, 22:1–3. Claims 2–7 directly or indirectly depend from independent claim 1, claims 9–14 directly or indirectly depend from independent claim 8, claims 16–22 directly depend from independent claim 15, claim 24 directly depends from independent claim 23, and claims 26 and 27 directly depend from independent claim 25. *Id.* at 17:58–18:19, 19:30–59, 20:49–21:3, 21:65–67, 23:1–6. Independent claim 1 is illustrative of the challenged claims and is reproduced below.

> 1.      A method of processing a payment transaction from a payer to a payee, the method being performed by one or more secure servers, the method comprising:
>
> providing, by the one or more secure servers to a merchant server providing a webpage to a payer computing system used by the payer, an application programming interface (API) that:
>
> provides financial account registration and token retrieval functions that can be executed to process the payment transaction;
>
> provides access to the financial account registration and token retrieval functions to the merchant server;
>
> receives, from the merchant server via the API, at least one data element associated with the payer and a payment amount from the payer to the payee;
>
> authenticates the payee; and
>
> executes the financial account registration function, upon initiation by the merchant server, by:
>
> generating a uniform resource locator (URL), for establishing a secure socket layer connection via the internet

IPR2024-01159
Patent 11,620,621 B2

between the secure server and the payer computing system, the URL comprising either:

a dynamic URL generated by the secure server for the payer and the payee; or

a static URL and a hypertext transport protocol (HTTP) parameter used by the secure server to identify the payer and the payee;

establishing the secure socket layer connection, in response to an HTTP request received from the merchant server for the generated URL, between the secure server and the payer computing system within a window or frame that is displayed within the webpage provided by the merchant server;

outputting instructions to the payer computing system, in response to the HTTP request for the generated URL, to render a financial account registration request form, within the window or frame that is displayed within the webpage provided by the merchant server, that provides functionality for the payer to provide sensitive financial account information associated with a financial account; and

outputting instructions to the payer computing system, in response to the HTTP request for the generated URL, to encrypt the sensitive financial account information provided by the payer and transmit the encrypted financial account information to the secure server via the secure socket layer connection;

receiving the sensitive financial account information provided by the payer via the secure socket layer connection;

storing the sensitive financial account information in a secure storage location and performing each software process required to maintain compliance with one or more information security standards;

executing a token retrieval function, upon initiation by the merchant server via the API, by:

providing a non-sensitive electronic data token representing the sensitive financial account information to the merchant server without providing the sensitive financial

IPR2024-01159
Patent 11,620,621 B2

account information to the merchant server and *without providing the non-sensitive electronic data token to the payer*; and

processing the payment transaction using the sensitive financial account information by generating and transmitting an electronic request requesting the payment amount from the financial account, obtaining the payment amount, and forwarding at least a portion of the payment amount to the payee.

*Id.* at 16:53–17:57 (emphasis added).

### E. Asserted Prior Art References

M&A Ventures relies on the prior art references set forth in the tables below.

| Name[1] | Reference | Dates | Exhibit No. |
|---|---|---|---|
| Schlesser | US 2012/0197807 A1 | published Aug. 2, 2012; filed Jan. 28, 2011 | 1020 |

---

[1] For clarity and ease of reference, we only list the first named inventor.

IPR2024-01159
Patent 11,620,621 B2

| Printed Publication | Exhibit No. |
|---|---|
| PayPal "Express Checkout Integration Guide" (Jan. 2011) | 1006 |
| PayPal "[Simple Object Access Protocol ("SOAP") Application Programming Interface ("API")] Developer Reference" (Apr. 2011) | 1007 |
| PayPal "Sandbox User Guide" (July 2010) | 1008 |
| PayPal "Preparing for the New Updated Checkout Experience" (May 2012) | 1009 |
| PayPal "Express Checkout User Interface Standards" (Oct. 2009) | 1010 |
| PayPal "Privacy Policy" (July 2010) | 1011 |
| PayPal "Digital Goods Integration Guide – [Express Checkout ("EC")] Edition" (Jan. 2012) | 1012 |
| PayPal "Instant Payment Notification Guide" (July 2010) | 1023 |
| PayPal "Name-Value Pair API Developer Guide" (Apr. 2011) | 1024 |
| PayPal "Merchant Setup and Administration Guide" (Jan. 2010) | 1025 |

*F. Asserted Grounds of Unpatentability*

    M&A Ventures challenges claims 1–27 of the '621 patent based on the asserted grounds of unpatentability set forth in the table below.  Pet. 22–103.

IPR2024-01159
Patent 11,620,621 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–7, 15–22, 25–27 | 103(a)[2] | PayPal[3] |
| 8–14, 23, 24 | 103(a) | PayPal, Schlesser |

## II.  ANALYSIS

### A.  Claim Construction

We apply the same claim construction standard used in the federal courts, in other words, the claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), which is articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  *See* 37 C.F.R. § 42.100(b).  Under the *Phillips* standard, "the words of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13.

In its Petition, M&A Ventures proposes constructions for three claim terms.  Pet. 10–21.  Two of the three claim terms are related terms found in different sets of independent claims.  The related terms include (1) the step of "providing a non-sensitive electronic data token representing the sensitive financial account information to the merchant server. . . *without providing*

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103, effective March 16, 2013.  Because the '621 patent claims the benefit of the '482 application, which was filed before this date, the pre-AIA version of § 103 applies. Ex. 1001, codes (21), (22), (60), (63).

[3] Petitioner considers all ten of the listed PayPal printed publications as a single prior art reference because each document covers a different aspect of the same product—namely, PayPal Express Checkout.  *See* Pet. 24–27.

IPR2024-01159
Patent 11,620,621 B2

*the non-sensitive electronic data token to the payer*," as recited in each of independent claims 1, 8, and 25 ("the 'providing' step"); and (2) the step of "receiving the non-sensitive data token from the secure server, wherein . . . the secure server *does not provide the non-sensitive electronic data token to the payer*," as recited in each of independent claims 15 and 23 ("the 'receiving' step").[4]  Pet. 11, 15 (emphasis added).  M&A Ventures also seeks construction of "generating a uniform resource locator (URL) . . . the URL comprising either:  a dynamic URL generated by the secure server . . . ; or a static URL and a hypertext transport protocol (HTTP) parameter," as recited in each of independent claims 1, 8, and 25 ("the 'generating' step"). *Id.* at 17.  In the Preliminary Response, Autoscribe does not seek construction of any claim terms.  *See* Prelim. Resp.

### 1.  "Providing" and "Receiving" Steps

Independent claims 1, 8, and 25 each recite, in relevant part, "providing a non-sensitive electronic data token representing the sensitive financial account information to the merchant server . . . *without providing the non-sensitive electronic data token to the payer*."  Ex. 1001, 17:46–51 (claim 1), 19:17–22 (claim 8), 22:56–61 (claim 25) (emphasis added). Independent claim 15 recites "receiving the non-sensitive data token from

---

[4] Independent claim 23 is directed to a "merchant server" programmed to perform certain functions, including "receive the non-sensitive electronic data token from the secure server, wherein the merchant server does not receive the sensitive financial account information represented by the non-sensitive electronic data token and the secure server does not provide the non-sensitive electronic data token to the payer."  Ex. 1001, 21:47–52. For purposes of our analysis below, we group this "receive" function together with the "receiving" step of independent claim 15 given the substantial similarity in claim language.

IPR2024-01159
Patent 11,620,621 B2

the secure server, wherein . . . the secure server *does not provide the non-sensitive electronic data token to the payer*." *Id.* at 20:33–38 (emphasis added). Similar to independent claim 15, independent claim 23 recites that the merchant server is programmed to "receive the non-sensitive electronic data token from the secure server, wherein . . . *the secure server does not provide the non-sensitive electronic data token to the payer*." *Id.* at 21:47–52 (emphasis added). In its Petition, M&A Ventures argues that these limitations should be construed as only limiting provision of the "non-sensitive data token" "*during execution of the token retrieval function*." Pet. 11, 15. M&A Ventures explains that "the claim language only requires that, *during the token retrieval function*, the secure server does not provide the token to the payer when it provides the token to the merchant." *Id.* at 11–12. M&A Ventures asserts that these limitations do not "mean that the secure server must never provide the token to the payer." *Id.* at 12 (citing Ex. 1003 ¶ 52).

In its Preliminary Response, Autoscribe contends that we should decline to adopt M&A Ventures's proposed constructions because M&A Venture is "trying to force a set of overly-broad constructions in an attempt to capture [the] cited references." Prelim. Resp. 5. Instead, Autoscribe contends that we should construe each claim term in accordance with its plain and ordinary meaning. *Id.* For the "providing" and "receiving" steps, Autoscribe argues that we need not construe these claim terms for three reasons: (1) M&A Ventures's asserted prior art references do not disclose each step "***regardless of how it is construed***"; (2) M&A Ventures's proposed construction is inconsistent with other limitations; and (3) M&A

IPR2024-01159
Patent 11,620,621 B2

Ventures's proposed construction is inconsistent with the prosecution history of the '621 patent. *Id.* at 6–12.

We must look to all the intrinsic evidence of record, including the claim language itself, the specification of the '621 patent, and its prosecution history, to determine whether the "providing" steps of independent claims 1, 8, and 25, and the "receiving" step of independent claims 15 and 23, should be limited temporally such that not providing the data token to the payer only occurs "*during execution of the token retrieval function.*" *See, e.g.*, *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006)("In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence.").

We start by addressing M&A Ventures's reliance on the claim structure of independent claims 1 and 15 to support its proposed constructions. M&A Ventures argues that independent claims 1 and 15 each include two discrete functions—namely: (1) the financial account registration function, and (2) the token retrieval function. Pet. 12 (citing Ex. 1003 ¶ 53), 15 (citing Ex. 1003 ¶¶ 63, 65). According to M&A Ventures, independent claims 1 and 15 each execute the financial registration function first by performing certain steps, and then separately execute the token retrieval function by performing additional steps, including the "providing" step of independent claim 1 and the "receiving" step of independent claim 15. *Id.* at 12 (citing Ex. 1003 ¶ 54), 15–16 (citing Ex. 1003 ¶ 66).

14

IPR2024-01159
Patent 11,620,621 B2

On its face, the claim structures of independent claims 1 and 15 appear to identify separately the financial account registration function and the token retrieval function together with the steps associated with each function.  *See* Ex. 1001, 17:2–57 (claim 1), 20:9–48 (claim 15).  However, the only place in these claims where the "token" is provided to anyone is in the "providing" step of independent claim 1 and the "receiving" step of independent claim 15 where the prohibition on providing the token to the payer is recited.  This may mean that the patentees intended the prohibition to be viewed as the payer never receiving the token at all, but we cannot say for certain based on claim structure alone.

Independent claim 23, which includes the "receive" function, does not share the same claim structures as independent claims 1 and 15. Independent claim 23 recites a "merchant server" programmed to perform certain functions.  Ex. 1001, 21:4–5.  Among those functions is "receive the non-sensitive electronic data token from the secure server, wherein the merchant server does not receive the sensitive financial account information represented by the non-sensitive electronic data token and the secure server does not provide the non-sensitive electronic data token to the payer."  *Id.* at 21:47–52.  Although it is not entirely clear, this limitation of independent claim 23 is more unequivocal that "the secure server does not provide the non-sensitive electronic data token to the payer."[5]  Notably, independent

_____

[5] We note that the independent claim 23 is directed to the "merchant server," but the disputed limitation purports to concern the functioning of the secure server.  M&A Ventures has not contended that this disputed limitation is not entitled to patentable weight because it relates to the functioning of the secure server, and not the merchant server, so we do not address that possibility.

IPR2024-01159
Patent 11,620,621 B2

claim 23 is an apparatus claim that does not require the prohibition on the
payer receiving the token to occur only during execution of the token
retrieval function. *See id.* at 21:24–64 (only listing the steps associated with
the financial account registration function and not listing separate steps for
the token retrieval function).

M&A Ventures further relies on certain disclosures in the
specification of the '621 patent to support its proposed constructions.
M&A Ventures contends, and Autoscribe does not dispute, that the
specification does not disclose expressly that the token is never, or can never
be, provided to the payer. *See* Pet. 13–14; Prelim. Resp. M&A Ventures
notes that the specification states that the token is "only meaningful to the
merchant," which M&A Ventures contends implies "that it is not meaningful
to the payer." Pet. 14 (first quoting Ex. 1001, 10:46–48)(citing Ex. 1003
¶ 59). Thus, M&A Ventures argues that "there would be no reason to
prevent the token from being sent to the payer." *Id.* (citing Ex. 1003 ¶¶ 57–
59).

With respect to the organization of the claimed functions,
M&A Ventures argues that "the specification describes the financial account
registration and token retrieval functions as being distinct." Pet. 13.
Although M&A Ventures correctly indicates that the specification states
"[a] hosted system on a secure server 202 provides **Financial Account
Registration functions and Token Retrieval functions**," the specification
is silent as to whether the steps associated with each function are mutually
exclusive. *Id.* (quoting Ex. 1001, 5:58–62). Indeed, outside the claims,
these two functions appear together only once more in the specification, but
this additional disclosure does not delineate that certain steps associated with

16

IPR2024-01159
Patent 11,620,621 B2

each function should be limited temporally such that they only occur during one function and not the other. *See* Ex. 1001, 6:63–7:1 ("The financial account registration and token retrieval functions provided in the API can be implemented, in a first example, within the merchant's website hosted on merchant server 204, in a 'widget' or frame using either static or dynamic URL access to secure server 202 (the hosted system that maintains the financial data.").

M&A Ventures also relies on the '482 application incorporated by reference into the '621 patent to support its proposed constructions. Ex. 1001, 1:7–14. M&A Ventures argues that the '482 application "contemplates that the non-sensitive electronic data token *is* provided to the payer outside of execution of the token retrieval function" because it discloses that "[t]he hosted system [secure server] returns a token or other account identifier **to the user** [payer] and/or the merchant's system **when the financial account information has been registered at the hosted system**." Pet. 14 (alterations in original) (quoting Ex. 1005, 21[6]) (citing Ex. 1005, 31–32; Ex. 1003 ¶ 60).

Although the '482 application discloses sending the token to the payer when the financial account information has been registered at the hosted system, M&A Ventures fails to explain how this particular disclosure that was included in the '482 application (i.e., a provisional application), but deleted in the '424 application that issued as the '621 patent (i.e., a non-provisional application), has any bearing on whether there is a prohibition on

---

[6] All references to the '482 application refer to the page numbers inserted by M&A Ventures in the bottom, right-hand corner of each page in Exhibit 1005.

IPR2024-01159
Patent 11,620,621 B2

providing the token to the payer only during execution of the token retrieval function. *See DDR Holdings, LLC v. Priceline.com LLC*, 122 F.4th 911, 915–18 (Fed. Cir. 2024) (noting that "[a] skilled artisan reading the incorporated provisional application in the context of the . . . specification would consider that 'merchants' providing 'services' was included in the provisional application, yet deleted by the patent drafter from the final specification"); *see also MPHJ Tech. Invs., LLC v. Ricoh Americas Corp.*, 847 F.3d 1363, 1366–69 (Fed. Cir. 2017) (determining that, in light of the "deletion from the . . . [p]rovisional application," a skilled artisan "would deem the removal of these limiting clauses to be significant," and when considering both "the change from the ... [p]rovisional to the final patent," and the statements in the issued patent that a single-step operation was "optional," the court concluded that a "person skilled in this field would reasonably conclude that the inventor intended that [the] single-step operation would be optional, not obligatory"). Stated differently, this cited disclosure in the '482 application does not provide a sufficient reason to prohibit the token from being sent to the payer only during execution of the token retrieval function.

Lastly, we turn to the prosecution history of the '621 patent. According to M&A Ventures, the prosecution history supports treating the claimed financial account registration function and the token retrieval function as separate functions because the patentee entered amendments to pending independent claims to overcome a 35 U.S.C § 101 rejection from the Examiner by grouping certain steps as being part of one function, but not

IPR2024-01159
Patent 11,620,621 B2

part of the other function.  Pet. 12 (citing Ex. 1002, 138–139[7]; Ex. 1003
¶¶ 55, 56); *see also id.* at 16 (arguing the same) (citing Ex. 1002, 125–126;
Ex. 1003 ¶¶ 67, 68).  It is well settled that prosecution history can still
"inform the meaning of the claim language by demonstrating how the
inventor understood the invention."  *Phillips*, 415 F.3d at 1317.  There is no
dispute that the amendments made to the pending independent claims were
in response a 35 U.S.C. 101 rejection made by the Examiner.  *See* Ex. 1002,
162, 462–463, 468–471.  At that stage in prosecution, there were no prior art
rejections made by the Examiner.  *See id.* at 462–463 (Examiner's Non-Final
Action stating "No Prior Art [R]ejection" (emphasis omitted)).  Even
accepting M&A Ventures's interpretation of the prosecution history, we do
not believe it provides much insight, beyond the claim language itself and
the disclosures in the specification that we discuss above, as to whether the

---

[7] All references to the prosecution history of the '621 patent refer to the page
numbers inserted by M&A Ventures in the bottom, right-hand corner of each
page in Exhibit 1002.

IPR2024-01159
Patent 11,620,621 B2

payer is prohibited from receiving the token only during execution of the token retrieval function.[8]

Finally, the supporting testimony from M&A Ventures's declarant, Mr. Mott, on this particular issue fares no better. Mr. Mott's supporting testimony is essentially the same as the arguments and evidence presented by M&A Ventures in support of its proposed constructions. *Compare* Pet. 11–17, *with* Ex. 1003 ¶¶ 52–70. Mr. Mott does not direct us to, nor can we

---

[8] We note that, based on our review of the prosecution history of the grandparent of the '621 patent, the '279 patent, the limitation at the center of this dispute—"without providing the non-sensitive electronic data token to the payer"—appears to originate in an amendment made during the prosecution of the '279 patent. In an amendment dated, February 21, 2014, the applicants for the '279 patent added the phrase "without providing said token to said payer" to the pending claims and added new claims that contained the limitation. *See* Ex. 3001. In their remarks, the applicants explained that, "[i]n this process, the payer does not receive the token, and the first computing system does not receive the financial account information." Ex. 3002, 10. The applicants relied on this to distinguish the prior art asserted by the Examiner, Hammad (US 2012/0259782 A1, published Oct. 11, 2012), explaining in Hammad, "[t]he consumer receives tokens that are later used to authenticate the consumer when making purchases at various merchants." *Id.* at 11. After noting this, applicants argued that "it should be apparent Hammad's approach to tokenization and payment differs substantially from the process recited in [then-pending claim 1]." *Id.* The applicants repeated those arguments in an Examiner interview and other responses to Office Actions. The Examiner eventually withdrew the prior art rejections based on Hammad in light of applicants' arguments. *See* Ex. 3003, 6. We reach our construction based only on the arguments and evidence cited by the parties, but we take this opportunity to note that the prosecution history of the '279 patent also supports our construction. In our claim construction analysis above, we address where the disputed negative limitation is implicated in the written description of the originally-filed specification of the '621 patent.

20

IPR2024-01159
Patent 11,620,621 B2

find, any additional disclosures in the specification of the '621 patent or in the prosecution history of the '621 patent that would support adopting M&A Ventures's proposed constructions of the "providing" and "receiving" steps as being limited temporally such that not providing the data token to the payer only occurs "*during execution of the token retrieval function*."

In summary, upon weighing all of the arguments and evidence bearing on the construction of the "providing" and "receiving" steps, we decline to construe these two steps as being limited temporally such that not providing the data token to the payer only occurs "*during execution of the token retrieval function*." Instead, we construe the "providing" and "receiving" steps in accordance with their plain and ordinary meanings, which includes giving the negative limitation recited therein (i.e., not providing the data token to the payer) patentable weight, without limiting the occurrence of this negative limitation during execution of the token retrieval function. *See Animal Legal Defense Fund v. Quigg*, 932 F.2d 920, 923 (Fed. Cir. 1991) ("The use of a negative limitation to define the metes and bounds of the claimed subject matter is a permissible form of expression.").

*2. Remaining Claim Terms*

For purposes of this Decision, the only claim terms that require construction are the "providing" and "receiving" steps, and no other claim terms require express construction. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").

IPR2024-01159
Patent 11,620,621 B2

### B. Obviousness Over the Combined Teachings of PayPal

M&A Ventures contends that claims 1–7, 15–22, and 25–27 of the '621 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combined teachings of PayPal. Pet. 24–94. M&A Ventures contends that the combined teachings of PayPal account for the subject matter of each challenged claim, and provides reasoning as to why a person of ordinary skill in the art would have been prompted to combine the ten listed references in PayPal. *Id.* M&A Ventures submits the testimony of Mr. Mott to support its positions. *See* Ex. 1003.

Based on this record, we determine that M&A Ventures has not shown that there is a reasonable likelihood that it would prevail in challenging any of the claims of the '621 patent as unpatentable. We begin our analysis with the principles of law that generally apply to an asserted ground based on obviousness, followed by an assessment of the level of skill in the art, next we provide overviews of PayPal, and then we address the parties' contentions with respect to independent claims 1, 15, and 25.

### 1. Principles of Law

A claim is unpatentable under § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, "would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of obviousness or non-

IPR2024-01159
Patent 11,620,621 B2

obviousness (i.e., secondary considerations, such as commercial success, long-felt but unsolved needs, failure of others, etc.).[9]  *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).  We analyze the asserted grounds based on obviousness with the principles we identify above in mind.

## 2.  Level of Skill in the Art

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention.  *Graham*, 383 U.S. at 17.  "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry."  *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).  The "person having ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed.  *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field."  *Env't Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)).  "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case."  *Id.* at 696–97.

---

[9] At this stage in the proceeding, Autoscribe does not present arguments or evidence of secondary considerations.  *See* Prelim. Resp.

IPR2024-01159
Patent 11,620,621 B2

In its Petition, M&A Ventures contends that a person having ordinary skill in the art "would have been knowledgeable and familiar with the field of payment processing systems. That person would have a bachelor's degree related to the field of payment processing systems and approximately two years of experience working in that field. Lack of education can be remedied by additional work experience, and vice versa." Pet. 10 (citing Ex. 1003 ¶¶ 28–30). In its Preliminary Response, Autoscribe does not address the level of skill in the art. *See* Prelim. Resp.

Accordingly, for purposes of this Decision, we adopt M&A Ventures's proposed formulation of the level of ordinary skill in the art because it is consistent with the '621 patent and the asserted prior art, and it is supported by the testimony of Mr. Mott.

### 3. Overview of PayPal

PayPal includes a series of documents that describes PayPal Express Checkout. Ex. 1006, 7. PayPal Express Checkout is a product that "enables [the merchant] to accept PayPal while retaining control of the buyer and the overall checkout flow." *Id.* at 9. According to M&A Ventures, PayPal includes ten printed publications that describe PayPal Express Checkout. Pet. 25. The diagram below describes the PayPal Express Checkout flow:



IPR2024-01159
Patent 11,620,621 B2

Ex. 1006, 10.  This diagram illustrates how the buyer (initially being on the merchant's website) is able to access PayPal Express Checkout by clicking on the button marked "Check out with PayPal." *Id.* (emphasis omitted). From there, the buyer is able to authenticate his/her identity by logging into PayPal.  *Id.*  Next, the buyer can review the transaction on PayPal, confirm the order, and then pay from the merchant's site.  *Id.*  Lastly, the buyer receives an order confirmation ending the transaction.  *Id.*

"The PayPal API provides three API operations for Express Checkout, which sets up the transaction, obtains information about the buyer, and handles the payment and completes the transaction," as shown in the table below:

| API Operation | Description |
|---|---|
| SetExpressCheckout | Sets up the Express Checkout transaction. You can specify information to customize the look and feel of the PayPal site and the information it displays. You must include the following information:<br>• URL to the page on your website that PayPal redirects to after the buyer logs into PayPal and approves the payment successfully.<br>• URL to the page on your website that PayPal redirects to if the buyer cancels.<br>• Total amount of the order or your best estimate of the total. It should be as accurate as possible. |
| GetExpressCheckout | Obtains information about the buyer from PayPal, including shipping information. |
| DoExpressCheckoutPayment | Completes the Express Checkout transaction, including the actual total amount of the order. |

Ex. 1006, 17.  This table illustrates how PayPal provides a command that redirects a buyer's browser to PayPal and enables the buyer "to log into PayPal to approve an Express Checkout payment."  *Id.*  According to PayPal, if the buyer approves the payment, PayPal redirects to the success

IPR2024-01159
Patent 11,620,621 B2

URL with the following information:  the token that was included in the redirect to PayPal and the buyer's unique identifier ("Payer ID").  *Id.*  The other commands may also "use[] a token to control access to PayPal and execute Express Checkout API operations."  *Id.*  For example, "[t]he SetExpressCheckout API operation returns a token, which is used by other Express Checkout API operations and by the _ExpressCheckout command to identify the transaction."  *Id.* at 18.

A merchant may test whether he/she correctly integrated PayPal Express Checkout by running this product in a sandbox environment.[10] Ex 1006, 23.  PayPal discloses instructions on how to do so, alongside the diagram below that explains how PayPal Express Checkout should run in the sandbox environment:

---

[10] According to M&A Ventures's declarant, Mr. Mott, "PayPal Sandbox is a tool provided by PayPal Express Checkout that allows merchants to test out various PayPal features and/or products in a self-contained environment before launching them on their website."  Ex. 1003 ¶ 130.

IPR2024-01159
Patent 11,620,621 B2



*Id.* This diagram illustrates six steps undertaken in the sandbox
environment, each of which matches the circled numbers on the diagram.
At step 1, a merchant can invoke a form on his/her website that calls the
"SetExpressCheckout" API on the PayPal sandbox server. *Id.* at 24. At step
2, if the API operation is successful, then the PayPal sandbox server
responds by providing a token. *Id.* at 25. At step 3, this token is used to
redirect the browser to the PayPal sandbox server to log in. *Id.* Step 4
occurs after the buyer logs into a test account, therein allowing confirmation

IPR2024-01159
Patent 11,620,621 B2

of the order details and further API operations. *Id.* At step 5, the merchant
may invoke a form on its website that calls the
"GetExpressCheckoutDetails" API operation on the PayPal sandbox server.
*Id.* at 26. If successful, the API "returns information about the payer" as
represented in the following simulated output:

```
TIMESTAMP=2007%2d04%2d05T23%3a44%3a11Z
&CORRELATIONID=6b174e9bac3b3
&ACK=Success
&VERSION=XX%2e000000
&BUILD=1%2e0006
&TOKEN=EC%2d1NK66318YB717835M
&EMAIL=YourSandboxBuyerAccountEmail
&PAYERID=7AKUSARZ7SAT8
&PAYERSTATUS=verified
&FIRSTNAME=...
&LASTNAME=...
&COUNTRYCODE=US
&BUSINESS=...
&PAYMENTREQUEST_0_SHIPTONAME=...
&PAYMENTREQUEST_0_SHIPTOSTREET=...
&PAYMENTREQUEST_0_SHIPTOCITY=...
&PAYMENTREQUEST_0_SHIPTOSTATE=CA
&PAYMENTREQUEST_0_SHIPTOCOUNTRYCODE=US
&PAYMENTREQUEST_0_SHIPTOCOUNTRYNAME=United%20States
&PAYMENTREQUEST_0_SHIPTOZIP=94666
&PAYMENTREQUEST_0_ADDRESSID=...
&PAYMENTREQUEST_0_ADDRESSSTATUS=Confirmed
```

*Id.* (annotation added). At step 6, the merchant can further create a form that
invokes the "DoExpressCheckoutPayment" API operation, which completes
the Express Checkout transaction, including the actual total amount of the
order. *Id.* at 17, 26. At step 7, if the operation is successfully completed,
then a "success" response is generated. *Id.* at 27.

### 4. *Claims 1, 15, and 25*

M&A Ventures contends that PayPal Express Checkout teaches all of
the limitations of independent claims 1, 15, and 25. Pet. 28–72, 84–89, 92–
93. Of particular importance to this obviousness ground is M&A Ventures's
assertion that PayPal meets the "providing" step recited in independent

IPR2024-01159
Patent 11,620,621 B2

claim 1, but only when adopting its proposed construction. *Id.* at 63–67. To satisfy this limitation, M&A Ventures contends that steps 5 and 6 of the PayPal Express Checkout Execution flow run in the sandbox environment teaches "providing a non-sensitive electronic data token . . . to the merchant server. . . without providing the non-sensitive electronic data token to the payer," because the response to the "GetExpressCheckoutDetails" API operation in step 5 only "returns information about the payer, including the Payer ID to the merchant, not the buyer," where the Payer ID represents "a non-sensitive electronic data token." *Id.* at 64–66 (emphasis omitted) (citing Ex. 1006, 24, 26; Ex. 1007, 100; 1003 ¶¶ 52–61, 208, 210–214). M&A Ventures relies on essentially the same arguments and evidence discussed above with respect to the "providing" step of independent claim 1 to account for both the "receiving" step of independent claim 15 and the "providing" step of independent claim 25. Pet. 88, 93.

   In its Preliminary Response, Autoscribe contends that PayPal Express Checkout does not teach the "providing" step of independent claim 1 because PayPal repeatedly provides the Payer ID to the buyer throughout the PayPal Express Checkout process. Prelim. Resp. 26–28. For example, Autoscribe notes that the Payer ID is sent to the buyer at step 4 of the PayPal Express Checkout flow run in the sandbox environment because it is part of the redirect URL provided by the PayPal Sandbox to the payer as shown below:

IPR2024-01159
Patent 11,620,621 B2



4. After logging into the buyer test account, confirm the details.

When you confirm, the Sandbox redirects your browser to the return URL you specified when invoking the SetExpressCheckout API operation, as in the following example:

http://www.YourReturnURL.com/
                ?token=EC-1NK66318YB717835M&PayerID=7AKUSARZ7SAT8

*Id.* at 26 (quoting Ex. 1006, 25–26 (cropped and annotated)); *see also* Ex. 1006, 17 ("If the buyer approves the payment, PayPal redirects to the success URL with the following information: . . . The buyer's unique identifier (Payer ID)."). Autoscribe asserts that, because PayPal provides the Payer ID to the buyer, it cannot teach the "providing" step of independent claim 1 "***without providing the non-sensitive electronic data token to the payer***." Prelim. Resp. 26–27.

Autoscribe also contends that, even if we were to accept M&A Ventures's construction that the "providing" step is limited temporally such that not providing the data token to the payer only occurs "during execution of the token retrieval function," PayPal still does not teach this limitation because the Payer ID is provided to the buyer at step 6 of the PayPal Express Checkout flow run in the sandbox environment. Prelim. Resp. 27. For example, Autoscribe contends that the Payer ID is part of the form that is used to invoke the "DoExpressCheckoutPayment" API operation in step 6 of the PayPal Sandbox as illustrated in the table below:

IPR2024-01159
Patent 11,620,621 B2

```
<form method=post action=https://api-3t.sandbox.paypal.com/nvp>
    <input type=hidden name=USER value=API_username>
    <input type=hidden name=PWD value=API_password>
    <input type=hidden name=SIGNATURE value=API_signature>
    <input type=hidden name=VERSION value=XX.0>
    <input type=hidden name=PAYMENTREQUEST_0_PAYMENTACTION
        value=Authorization>
    <input type=hidden name=PAYERID value=7AKUSAR27SAT8>
    <input type=hidden name=TOKEN value= EC%2d1NK66318YB717835M>
    <input type=hidden name=PAYMENTREQUEST_0_AMT value= 19.95>
    <input type=submit name=METHOD value=DoExpressCheckoutPayment>
</form>
```

*Id.* at 27–28 (citing Ex. 1006, 27 (annotations in original)).  Based on this table describing the "DoExpressCheckoutPayment" API operation in step 6 of the PayPal Sandbox, Autoscribe asserts that PayPal provides the Payer ID to the payer and, therefore, does not teach the "providing" step of independent claim 1.  *Id.* at 28.

We agree with Autoscribe's argument that PayPal Express Checkout does not teach the "providing" steps of independent claim 1 and 25 and the "receiving" step of independent claim 15 for two reasons.  First, as we explain in our claim construction analysis above, we decline to adopt M&A Ventures's proposed construction of the "providing" and "receiving" steps as being limited temporally such that not providing the data token to the payer only occurs "*during execution of the token retrieval function*."  Instead, we construe the "providing" and "receiving" steps in accordance with their plain and ordinary meanings, which includes giving the negative limitation recited therein (i.e., not providing the data token to the payer) patentable weight, without limiting the occurrence of this negative limitation during execution of the token retrieval function.  *See supra* Section II.A.1.

IPR2024-01159
Patent 11,620,621 B2

With this construction in mind, step 4 of the PayPal Express Checkout flow run in the sandbox environment plainly sends the Payer ID, which M&A Ventures maps to the claimed "data token," to the buyer.  Ex. 1006, 17, 25–26; *see also* Pet. 64 (arguing PayPal's Payer ID teaches the "non-sensitive electronic data token" (emphasis omitted)), 67 (arguing the same).  Because PayPal sends the Payer ID to the buyer during the PayPal Express Checkout flow, PayPal provides the data token to the payer and, therefore, violates the negative limitation required by the "providing" and "receiving" steps.

Second, even if we were to adopt M&A Ventures's proposed constructions for the "providing" and "receiving" steps, there is insufficient evidence in the record before us to determine whether the Payer ID is not sent to the buyer during steps 5 and 6 of the PayPal Express Checkout flow run in the sandbox environment, which M&A Ventures maps to the claimed "token retrieval function."  *See* Pet. 64 (citing Ex. 1006, 24; Ex. 1003 ¶ 208).  M&A Ventures relies on evidence within the Express Checkout Guide (Ex. 1006, 26–27) that only describes the form that a merchant can invoke, within the sandbox environment, to use the "DoExpressCheckoutPayment" API function, and what information this API function returns regarding the buyer.  *See* Ex. 1006, 26. These actions and results, however, are only from the perspective of the merchant.  PayPal does not address what a potential buyer is receiving in this sandbox environment.

Indeed, consistent with other disclosures in PayPal, it seems likely that a potential buyer may still receive the Payer ID at some point during steps 5 and 6 of the PayPal Express Checkout flow because these steps implicate payment approval and confirmation.  *See* Ex. 1006, 17, 25–26.

IPR2024-01159
Patent 11,620,621 B2

Notably, when addressing the "providing" step of independent claim 1, M&A Ventures does not address squarely the relevant disclosure on page 17 of Exhibit 1006 in the Petition, which discloses that the buyer receives the Payer ID during payment approval and confirmation. *See* Pet. 63–67.

   The supporting testimony from M&A Ventures's declarant, Mr. Mott, on this particular issue fares no better. Mr. Mott's supporting testimony only addresses the perspective of the merchant in the PayPal Express Checkout flow run in the sandbox environment —not the perspective of the buyer. Ex. 1003 ¶¶ 213, 214, 272, 303. Mr. Motts provides no additional explanation beyond the arguments and evidence presented in the Petition to support M&A Ventures's assertion that the Payer ID is not provided to the buyer in the sandbox environment.

   For all the reasons we identify above, we are not persuaded that PayPal Express Checkout teaches the "providing" steps of independent claims 1 and 25 and the "receiving" step of independent claim 15. Accordingly, M&A Ventures has not shown a reasonable likelihood that it would prevail on its assertions that the subject matter of independent claims 1, 15, and 25 would have been obvious over the combined teachings of PayPal.

### 5. *Claims 2–7, 16–22, 26, and 27*

   By virtue of their dependency, claims 2–7, 16–22, 26, and 27 include the same limitations as one of independent claims 1, 15, or 25. M&A Ventures does not present arguments or evidence with respect to these dependent claims that remedy the deficiencies in its obviousness analysis of independent claims 1, 15, and 25. *See* Pet. 72–84, 89—94. Accordingly, M&A Ventures has not shown a reasonable likelihood that it would prevail

IPR2024-01159
Patent 11,620,621 B2

on its assertions that the subject matter of dependent claims 2–7, 16–22, 26, and 27 would have been obvious over the combined teachings of PayPal.

### C. Obviousness Over the Combined Teachings of PayPal and Schlesser

M&A Ventures contends that claims 8–14, 23, and 24 of the '621 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combined teachings of PayPal and Schlesser. Pet. 94–103. M&A Ventures contends that the combined teachings of PayPal and Schlesser account for the subject matter of each challenged claim, and provides reasoning as to why a person of ordinary skill in the art would have been prompted to combine these references. *Id.* M&A Ventures submits the testimony of Mr. Mott to support its positions. *See* Ex. 1003.

Based on this record, we determine that M&A Ventures has not shown that there is a reasonable likelihood that it would prevail in challenging any of the claims of the '621 patent as unpatentable. We begin our analysis by addressing the parties' contentions with respect to independent claims 8 and 23.

### 1. Claims 8 and 23

M&A Ventures relies on essentially the same arguments and evidence discussed above with respect to the "providing" step of independent claim 1 and the "receiving" step of independent claim 15 to account the "providing" step of independent claim 8 and the "receive" step of independent claim 23. Pet. 99, 102. For the same reasons we identify above with respect to the "providing" step of independent claim 1 and the "receiving" step of independent claim 15, we agree with Autoscribe's argument that PayPal Express Checkout does not teach the "providing" step of independent claim 8 and the "receive" step of independent claim 23. *See supra* Section II.B.4.

IPR2024-01159
Patent 11,620,621 B2

As applied by M&A Ventures, Schlesser does not remedy the deficiencies in M&A Ventures's obviousness analysis because M&A Ventures only relies on Schlesser as "evidence that the servers used in financial transactions—such as PayPal's—include hardware such as processors and memory." Pet. 94. Accordingly, M&A Ventures has not shown a reasonable likelihood that it would prevail on its assertions that the subject matter of independent claims 8 and 23 would have been obvious over the combined teachings of PayPal and Schlesser.

### 2. Claims 9–14 and 24

By virtue of their dependency, claims 9–14 and 24 include the same limitations as one of independent claims 8 or 23. M&A Ventures does not present arguments or evidence with respect to these dependent claims that remedy the deficiencies in its obviousness analysis of independent claims 8 and 23. *See* Pet. 99–100, 103. Accordingly, M&A Ventures has not shown a reasonable likelihood that it would prevail on its assertions that the subject matter of dependent claims 9–14 and 24 would have been obvious over the combined teachings of PayPal and Schlesser.

### III. CONCLUSION

Taking into account Autoscribe's Preliminary Response, we conclude that the information presented in the Petition does not demonstrate that there is a reasonable likelihood that M&A Ventures would prevail in challenging any one of claims 1–27 of the '621 patent as unpatentable.

### IV. ORDER

In consideration of the foregoing, it is ORDERED that the Petition is *denied* and no trial is instituted.

35

IPR2024-01159
Patent 11,620,621 B2


For PETITIONER

Calmann J. Clements
Andrew S. Ehmke
Brooke E. Parker
HAYNES AND BOONE, LLP
calmann.clements.ipr@haynesboone.com
andy.ehmke.ipr@haynesboone.com
brook.parker.ipr@haynesboone.com

For PATENT OWNER

Sujeeth Rajavolu
AHMAD ZAVITSANOS & MENSING PLLC
srajavolu@azalaw.com