IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AUTOSCRIBE CORPORATION,

    Plaintiff,

    v.

M & A VENTURES, LLC,

    Defendant.

Civil Action No. 1:24-CV-4282-SCJ

**SPECIAL MASTER'S REPORT AND RECOMMENDATION
ON CLAIM CONSTRUCTION**

The Special Master submits this Report and Recommendation under the Court's November 8, 2024 Order Appointing Special Master. ECF 130.[1] The Court appointed the undersigned Special Master to preside over claim construction issues in this case. *Id.* This Report and Recommendation addresses claim construction concerning United States Patent No. 11,620,621 (the "'621 Patent") asserted by Plaintiff Autoscribe Corporation ("Autoscribe") against Defendant M&A Ventures ("M&A").

Under the Local Patent Rules, the parties have submitted their Joint Claim Construction Statement (ECF 98, 147, and 148), along with their respective opening and responsive claim construction briefs and evidence in support (ECF 139, 140, 141, and 142).

This Report and Recommendation follows a careful review of the documents submitted by the parties, including the patents and prosecution histories, and the parties' presentations and submissions at the March 6, 2025 claim construction hearing. A summary of the Special Master's recommendations is included in a table at the end of this report.

---

[1] Docket citations (ECF) refer to the Electronic Case File (ECF). Unless otherwise indicated, pinpoint citations are to the ECF-generated page numbers at the top of documents.

## I.    BACKGROUND

Autoscribe has asserted that M&A has infringed the '621 Patent. ECF 99 at 5-21 (Count I). M&A denies infringement and has asserted numerous defenses, including invalidity of the '621 Patent. ECF 101 at 7 (Third Defense).

The '621 Patent relates to a method, a secure server, and a merchant server for the processing of payments to a merchant without requiring the merchant to store certain financial account information of a payer. This involves the use of an application programming interface (API) that allows for a payer's financial account information to be entered and transferred to the secure server, the secure server creating a token to represent the financial account information, and sending that token to the merchant server. The secure server then acts as the intermediary between the merchant and the financial institution, sending the financial account information to the financial institution, and allowing the merchant to be paid. The benefit of the '621 Patent is to allow the merchant to receive payments without requiring the merchant server to comply with information security standards such as the Payment Card Industry Data Security Standard (PCI DSS).

## II.    LEGAL STANDARDS

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (quoting *Innova/Pure Water Inc. v. Safari Water*

*Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is the process of determining the meaning of words in those claims and is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

Courts determine the meaning of patent claims starting with the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms "their ordinary and customary meaning" as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312-13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.*

Patents include a written description—or "specification"—of the invention that enables a person of ordinary skill in the art to make and use the invention. *Phillips*, 415 F.3d at 1323. Patent "claims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the scope of a claim term. *Phillips*, 415 F.3d at 1316. In these situations, "the inventor's lexicography governs." *Id.* But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir.

2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although evidence outside the claims, specification, and prosecution history—called "extrinsic evidence"—can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not indicate how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The concept of indefiniteness is relevant to some claim terms in this Report and Recommendation. The definiteness requirement of 35 U.S.C. § 112, ¶ 2 requires

that patent claims, when viewed in light of the specification, inform "those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998); *accord Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III.    PERSON OF ORDINARY SKILL IN THE ART

A preliminary matter to address before engaging in a construction of the claims is the issue of the level of skill in the art applicable to the interpretation of the '621 Patent. *See Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1338 (Fed. Cir. 2003) ("The words used in the claims must be considered in context and are examined through the viewing glass of a person skilled in the art.").

Neither party directly addresses the appropriate level of skill in the art in their briefings, nor at the hearing. M&A's expert did proffer the following:

> [A] person of ordinary skill in the art ("POSITA") in the field of the '621 Patent, as of the earliest potential priority date of June 5, 2012, would have a bachelor's degree in electrical engineering, computer engineering, computer science, or equivalent training. A POSITA would also have approximately two years of work experience in software development with an emphasis on web-based protocols for eCommerce and would be familiar with the PCI Standards. Less work experience could be remedied by additional education, and vice versa.

ECF 139-2, ¶ 42. As Autoscribe did not rebut this definition or offer its own definition, the Special Master presumes Autoscribe agrees with M&A's definition. Therefore, the Special Master recommends the Court adopt M&A's proposed level of skill in the art.

## IV.    TERMS PROPOSED FOR CONSTRUCTION

The list of claim terms proposed for construction by the parties evolved significantly since the parties submitted their Joint Claim Construction Charts. *See* ECF 98. Over the course of the parties' briefings, the parties reached agreement on terms and dropped other terms. *See* ECF Nos. 147 and 148. The Special Master considers the operative list of claim terms requiring construction to include those claim terms that were both briefed and presented by the parties at the March 6, 2025 claim construction hearing, as listed below:[2]

- "sensitive financial account information" (Claims 1, 8, 15, 23, 25, and other dependent claims);

---

[2] The parties briefed the following additional claim terms: "providing a non-sensitive data token to the merchant ... without providing the non-sensitive data token to the payer" (Claims 1, 8, and 25); "receiving the non-sensitive electronic data token from the secure server, wherein ... the secure server does not provide the non-sensitive electronic data token to the payer" (Claims 15 and 23); and "generating a uniform resource locator (url), ... the url comprising either: a dynamic url generated by the secure server ...; or a static url and a hypertext transport protocol (http) parameter..." (Claims 1, 8, and 25). M&A withdrew its proposed constructions, agreeing that each term shall be given its plain and ordinary meaning. ECF 147 at 2; ECF 148 at 2.

- "obtain[ing] the [second] payment amount" and "forward[ing] at least a portion of the [second] payment amount" (Claims 1, 2, 8, 9, 15, 23, and 25);

- "authenticate[s] a payee" and "authenticating the payee" (Claims 1, 8, 15, 23, and 25);

- "function" (Claims 1, 8, 15, 23, and 25);

- "perform[ing] each software process required to maintain compliance with one or more information security standards" (Claims 1, 8, and 25);

- "a representation of the non-sensitive electronic data token" (Claims 2, 9, 15, and 23); and

- "wherein the representation of the non-sensitive electronic data token is the non-sensitive electronic data token" (Claims 3, 10, and 16).

## V.    AGREED TERMS

The parties' Joint Claim Construction Statement and Revised Claim Construction Statement identify several agreed-upon constructions. ECF 98; ECF 147; ECF 148. The Special Master recommends the Court adopt the parties' agreement, listed in the table below.

| TERM | AGREED CONSTRUCTION |
|---|---|
| "secure server(s)" (Claims 1, 8, 15, 23, 25, and other dependent claims) | Plain and ordinary meaning |
| "providing a non-sensitive data token to the merchant... without providing the non-sensitive data token to the payer" (Claims 1, 8, and 25) | Plain and ordinary meaning |

| TERM | AGREED CONSTRUCTION |
|---|---|
| "receiving the non-sensitive electronic data token from the secure server, wherein...the secure server does not provide the non-sensitive electronic data token to the payer" (Claims 15 and 23) | Plain and ordinary meaning |
| "generating a uniform resource locator (url),... the url comprising either: a dynamic url generated by the secure server...; or a static url and a hypertext transport protocol (http) parameter..." (Claims 1, 8, and 25) | Plain and ordinary meaning |

## VI.    DISPUTED TERMS

### A. Disputed Terms of the '621 Patent

#### 1. "sensitive financial account information" (Claims 1, 8, 15, 23, 25, and other dependent claims)

| Autoscribe's Proposed Construction | M&A's Proposed Construction | Special Master's Recommendation |
|---|---|---|
| Not indefinite;<br><br>Plain and ordinary meaning | Indefinite;<br><br>*Alternatively*, "financial account information whose storage requires compliance with one or more information security standards" | Not indefinite;<br><br>Plain and ordinary meaning |

#### a) Indefiniteness

M&A argues that the term "sensitive financial account information" is

indefinite because a POSITA would not have understood how to determine whether

9

a given set of guidance is an "information security standard" or not, and the concepts of "sensitive financial account information" and "information security standard" are linked in the '621 Patent. ECF 139 at 13; Claim Construction Tr. 29:2-10. Autoscribe argues the term is not indefinite, as "information security standard" is not indefinite.

The Special Master agrees "sensitive financial account information" is not indefinite because the term "information security standard" is not indefinite. M&A's argument hinges on "information security standard" being indefinite, and it admits that if "information security standard" is not indefinite, then neither is "sensitive financial account information." Claim Construction Tr. 29:11-16 (proposing an alternative construction for "sensitive financial account information" if the Special Master "disagree[s] with us that information security standard is indefinite."). The Special Master disagrees that "information security standard" is indefinite, and therefore neither is this claim term.

A full explanation of the Special Master's ruling and reasoning regarding the term "information security standard" is below in Section VI.A.5.

**b) Claim Construction**

Autoscribe argues that "sensitive financial account information" should be given its plain and ordinary meaning. ECF 140 at 8. Specifically, Autoscribe argues that the term "sensitive" has a well-known meaning, and when combined with the term "financial account information," the phrase means financial account

information that must be kept secret because it could damage the consumer, such as through fraud or identity theft. Claim Construction Tr., 34:4-12. Autoscribe cites dictionary definitions and a portion of the specification of the '621 Patent which describes "sensitive financial account information" as "information [that] could be used to perpetrate a fraud in the case of a security breach." ECF 140 at 9 (citing '621 Patent at 8:12-14).

M&A argues that the '621 Patent delineates between "sensitive" and "non-sensitive" information. Specifically, "sensitive" information must be stored in the secure server, while "non-sensitive" information (such as the token) can be shared with the merchant server. ECF 139 at 12-13. And as the stated benefit of the '621 Patent is to reduce the cost to the merchant of complying with information security standards such as PCI DSS, and that combined with the claim language itself must limit the term "sensitive financial information" to information that must be stored in the secure server because it must comply with information security standards. ECF 142 at 10-11; Claim Construction Tr., 29:2-33:2.

The Special Master agrees "sensitive financial information" should be given its plain and ordinary meaning. In construing claims, the words of a claim are generally given their plain and ordinary meaning. *Phillips*, 415 F.3d at 1312. Here, "sensitive financial information" has a commonly understood ordinary meaning of financial information (e.g., bank account number or credit card number) that could

be used by a third-party in a fraudulent manner – such as to make purchases or otherwise transfer money without the consent of the financial account owner. Therefore, the question is whether a POSITA would understand the term "sensitive" in a more narrow manner because of the context of the patent. Specifically, the context of the '621 Patent's discussion of information security standards, such as PCI DSS. M&A argues yes. The Special Master disagrees.

Though the '621 Patent discusses information security standards and that a benefit of the claimed invention is reducing the cost of complying with these standards, it is not so narrowly restricted. For example, Claims 15 and 23 do not include the term "information security standard," yet they describe the handling of "sensitive financial account information." Moreover, the specification states that the "secure server…***preferably*** meets acknowledged security standards, such as PCI compliance" – not that it ***must*** meet the information security standards. '621 Patent, 10:51-53 (emphasis added). The '621 Patent also describes other benefits besides reducing costs related to compliance with information security standards, such as "reducing…development costs, and accelerating time-to-market." '621 Patent, 6:2-4. It is clear that the '621 Patent is not limited only to systems and methods where the secure server complies with information security standards. Thus, the Special Master rejects M&A's argument that "information security standard" and "sensitive financial information" are necessarily connected.

The intrinsic evidence supports the plain and ordinary meaning. The specification discusses "sensitive financial account information" as "information [that] could be used to perpetrate a fraud." '621 Patent, 8:12-14. The claims themselves also give "credit card number or bank account number" as specific examples of "sensitive financial account information." *See* Claims 7, 14, 22. From this, a POSITA would understand that "sensitive financial account information" is being used in its ordinary manner.

Accordingly, the Special Master recommends the term "sensitive financial account information" be given its plain and ordinary meaning.

### 2. "obtain[ing] the [second] payment amount" and "forward[ing] at least a portion of the [second] payment amount" (Claims 1, 2, 8, 9, 15, 23, and 25)

| Autoscribe's Proposed Construction | M&A's Proposed Construction | Special Master's Recommendation |
|---|---|---|
| "obtain[ing] the [second] payment amount and caus[ing] at least a portion of the [second] payment amount to be transferred" | "obtain[ing] the money required for the [second] payment" and "forward[ing] at least a portion of the money required for the [second] payment" | "obtain[ing] the money required for the [second] payment" and "forward[ing] at least a portion of the money required for the [second] payment" |

The Parties dispute whether "payment amount" in these claim limitations is information about the money to be paid or the money itself.

Autoscribe argues that "payment amount" is information about the money and the claims do not require the money to be transferred to the secure server. Autoscribe

makes two arguments in support.[3] First, the antecedent basis of "payment amount" indicates it refers to the transaction value, not the money itself. ECF 141 at 10. Autoscribe argues that "payment amount" is used elsewhere in the claims to refer to transaction value, and therefore must be construed the same here. *Id.* Autoscribe also refers to the prosecution history as demonstrating the intent that the secure server be different from the entity that causes the payment amount to be transferred. *Id.* at 11-12. Second, M&A's construction would eliminate a preferred embodiment that allows for ACH transactions to be processed, and that M&A's construction would eliminate the possibility of ACH transfers because they must be bank-to-bank transfers. *Id.* at 13.

M&A argues that "payment amount" refers to the actual money itself in the "obtaining" and "forwarding" terms and that the claim term requires the actual money to be forwarded by the secure server. ECF 139 at 14. To support that "payment amount" means actual money, M&A points to the claim language, whereby it refers to "at least one data element associated with…a payment amount"

---

[3] Autoscribe also argues that M&A's construction would incorrectly narrow the scope of the '621 Patent because it "was designed to cover a situation where… the payment processor processes the payment but does not actually receive or disburse the money itself." ECF 141 at 13. Autoscribe cites no evidence to support this argument, therefore the Special Master will not address pure attorney argument. *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence."); *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017).

to refer to transaction value as compared to the term at issue, where "payment amount" means money. *Id*. at 14-15. M&A points out that obtaining the payment amount would be redundant if it referred to the transaction value, as the secure server was already provided the transaction value by the merchant server. *Id*. at 16. Further, M&A argues that you cannot forward "at least a portion of" a transaction value, thus "payment amount" must mean actual money. ECF 142 at 14-15.

"A word or phrase **used consistently** throughout a claim should be interpreted consistently." *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) (emphasis added). However, where it is clear from the intrinsic evidence that the term has different meanings at different portions of the claims, the claim term can be construed differently throughout the claim. *Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318-1319 (Fed. Cir. 2001). Here, the parties agree that the first instance of payment amount in Claim 1 refers to information about the transaction value. ECF 139 at 15; ECF 141 at 10. There is sufficient intrinsic evidence such that a POSITA would understand the later instances of "payment amount" are construed differently – as the actual money.

Beginning with the last use of "payment amount" in Claim 1, the Special Master agrees with M&A that the term "payment amount" in the "forwarding" clause refers to the amount of money required for payment rather than the transaction

value. This interpretation is supported by the context of the claims and the intrinsic evidence.

The context of the claim supports this construction. "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms" and "the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. Here, claim 1 requires "forwarding **at least a portion** of the payment amount to the payee." '621 Patent, 17:56-57 (emphasis added). Therefore, this use of the "payment amount" must be something that can be apportioned. Autoscribe's assertion that "payment amount" is the transaction value (e.g., information) does not make sense in this context. Nothing in the specification or prosecution history explains how the transaction value information could be apportioned. When discussing this issue, counsel for Autoscribe acknowledged that the reason for the "at least a portion" language in the claim is because the secure server keeps a portion of the transactions as its fee. Claim Construction Tr., 70:9-71:14. Autoscribe makes clear that money, rather than any transaction value information, is being subdivided, with a portion going to the merchant and a portion going to the operator of the secure server.

Autoscribe's invocation of the *Process Control* case is not persuasive. Claim Construction Tr., 44:21-45:8. In *Process Control*, the Federal Circuit held that, in the context of the relevant claims, a POSITA would interpret multiple uses of the

16

term "discharge rate" as the same rate. *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999). As a result, the *Process Control* claims were nonsensical and invalid for indefiniteness. *Id.* Like in *Process Control*, construing all instances "payment amount" in claim 1 as transaction value information would lead to nonsensical claims, as described above. However, unlike in *Process Control*, here, there are contextual clues in claim 1 that would show a POSITA that "payment amount" in the "forwarding" clause is the money, not the transaction value information.

This interpretation of "payment amount" in the "forwarding" clause is supported, rather than contradicted, by the intrinsic evidence. The much-debated comment from the prosecution history talks about the "payment amount to be transferred," indicating that the "payment amount" is the money that will be transferred in response to the electronic request. The specification also states that "[t]he operator of the secure server 202 then processes the payment using the financial account pointed to by the token, and makes the proceeds available to the merchant." '621 Patent, 9:16-19. This intrinsic evidence is consistent with the interpretation of "forwarding … the payment amount" as forwarding the money. This consistency, coupled with the context of the claims, indicates that "forwarding … the payment amount" should be construed as forwarding the money.

The Special Master finds there is insufficient support for Autoscribe's supplemental proposed construction of "forwarding" as "causing … to be transferred." Claim terms are generally given their plain and ordinary meanings to a POSITA in the context of the intrinsic evidence. *Phillips*, 415 F.3d at 1313. There is no evidence on the record that "causing … to be transferred" described the plain and ordinary meaning of "forwarding." There is also insufficient evidence to redefine forwarding from its plain and ordinary meaning.

There are only two exceptions to construing terms as their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). To change the meaning of a claim term, the redefinition must be "clear and unmistakable." *See GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). Autoscribe asserts that the prosecution history comment discussing "the entity that causes the payment amount to be transferred" is lexicography. Special Master disagrees. This comment, not even directed to the "forwarding" portion of the claim, does not meet the standard required to redefine "forwarding." Therefore, construing "forwarding" as "causing … to transfer" is not warranted.

18

Having determined that "payment amount" in the "forwarding" clause is the money itself, the Special Master now analyzes the "obtaining" clause. "Payment amount" in the "obtaining" clause must also be construed as the money; otherwise, the clause is meaningless.

Claim terms should be interpreted so as not to make claim language superfluous. *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."). Construing "payment amount" as transaction value information does not make sense in the context of the claims and does not have support in the specification. Claim 1 of the '621 Patent requires a three-step process for the secure server to process the payment transaction:

1. generating and transmitting an electronic request requesting the payment amount from the financial account,

2. obtaining the payment amount, and

3. forwarding at least a portion of the payment amount to the payee.

'621 Patent, Claim 1; *see also id*., Claims 8 and 25. This occurs several steps after the secured server "receives, from the merchant server, a payment amount from the payer to the payee." *Id*. at Claims 1 and 25. In this context, it does not make sense that the secured server would receive transaction value information that it already possesses at this point in the method. Additionally, there is nothing in the

specification that describes the secured server obtaining transaction value information as part of the "processing of a payment transaction" portion of the method. Therefore, construing the "obtaining" clause "payment amount" term as transaction value information would render the clause superfluous in the context of the entire claim. Rather, construing "payment amount" as the money in both the "obtaining" and "forwarding" clauses gives meaning to both steps in the context of the claims and the specification's description that the "operator of the secure server … makes the proceeds available to the merchant." '621 Patent at 3:6-9.

Autoscribe also contends that M&A's construction is improper because it fails to cover a preferred embodiment. The Special Master disagrees with this contention.

"Federal Circuit precedent indicates that a proposed construction normally cannot stand if it fails to cover a preferred embodiment disclosed in the specification of the patent." *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, No. 1:05-cv-2482-ODE, 2006 WL 6142860, at *4 (N.D. Ga Sept. 18, 2006). Autoscribe contends that M&A's construction would exclude ACH transfers. The specification states that  "[t]ransactions processed may include, for example, credit card, ACH, and any other type of transaction processed using stored financial information." '621 Patent at 10:58-60. Autoscribe asserts that because "[a]n ACH transfer is 'an electronic transfer of funds from one bank account [] to another'", it would be excluded under M&A's proposed construction. ECF 141 at 13. However, the

extrinsic evidence provided by Autoscribe, which describes both ACH debits and credits, does not indicate it is incapable of being used for the secure server to obtain the payment amount, then forward it to the payee. ECF 141-2 at 3. Therefore, Autoscribe's assertion that M&A's construction would exclude a preferred embodiment is unsupported. Weighed against M&A's extrinsic evidence indicating that ACH is not excluded, Special Master does not find that M&A's proposed construction excludes a preferred embodiment.

At the *Markman* Hearing, Autoscribe introduced a grammatical argument that the term "electronic request" in the last paragraph of claim 1 modified both the "obtaining" and "forwarding" clauses. Claim Construction Tr., 69:17-70:8. Put another way, Autoscribe contends that this paragraph describes three electronic requests rather than three steps in which the first step is an electronic request. The Special Master disagrees. In addition to not being the plain grammatical reading of this claim language, the prosecution history contradicts this interpretation. ECF 139-11 at 14. Therefore, this argument is unpersuasive.

Accordingly, the Special Master recommends that the "obtaining" and "forwarding" terms be construed as "obtain[ing] the money required for the [second] payment" and "forward[ing] at least a portion of the money required for the [second] payment."

### 3. "authenticate[s] a payee" and "authenticating the payee" (Claims 1, 8, 15, 23, and 25)

| Autoscribe's Proposed Construction | M&A's Proposed Construction | Special Master's Recommendation |
|---|---|---|
| Plain and ordinary meaning<br><br>*Alternatively*, "verifie[s] the legitimacy of a payee/verifying the legitimacy of the payee" | "verify[ies] the identity of the payee/verifying the identity of the payee" | "verify[ies] the identity of the payee/verifying the identity of the payee" |

Though both parties seem to agree that this term should be given its plain and ordinary meaning, there is disagreement as to what the plain and ordinary meaning of "authenticate" is. Claim Construction Tr., 77:6-14. Therefore, the Special Master finds that construction is appropriate to assist the finder of fact.

Autoscribe argues that authentication is a genus, and that identity verification is but one species within that genus. ECF 140 at 15. Autoscribe further argues that within the genus of authentication is determining whether a user has *authority*. *Id*. Further, Autoscribe argues that at least one described embodiment (authentication step 578 of FIG. 4f) would be read out if "authentication" was limited to identity verification. *Id*. at 16; ECF 141 at 14. As examples, Autoscribe proffered that customers may be authenticated through "an assigned access key, password," a coded token, "or other data." Claim Construction Tr., 82:19-83:8. Autoscribe further argues that M&A's position in a parallel *inter partes* review (IPR) proceeding was

that authentication can include determining authorization. ECF 140 at 16; Claim Construction Tr., 84:17-23. Autoscribe also argues that if "authentication" means verifying identity, then that renders superfluous language in claim 15: "the authentication credentials identifying the payee and authenticating the payee." Claim Construction Tr., 85:3-15.

M&A argues that although the '621 Patent does not specifically describe the process of authenticating a payee, it does describe the process of authenticating a payer as verifying the payer's identity. ECF 139 at 18. Therefore, "authenticating" in the contexts of the payer and the payee should be construed the same. *Id.* at 18-19. M&A further cites dictionary definitions in support of its proposed construction. *Id.* at 19. M&A argues that "authorize" and "authenticate" are two different words with two different meanings: authorize focuses on whether certain actions are allowed and authentication focuses on verifying a user's identity. *Id.* at 20. Regarding the position M&A took in the IPR, it argues the position was consistent. ECF 142 at 18.

The Special Master agrees that authentication of a payee requires verifying the identity of said payee. While the '621 Patent does not explicitly describe the process of authenticating a payee, it does describe the authentication of payers. Because there is no indication in the '621 Patent that "authentication" is used differently in relation to payers as compared to payees, the term should be construed

to "render[] the patent internally consistent." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1380 (Fed. Cir. 2001) Therefore, the discussion of authenticating a payer in the specification is relevant to the construction of this claim term.

The '621 Patent states that payers "may be invited to enter a shared secret, such as an assigned access key, partial or complete social security number, account number, telephone number, password, or other data to authenticate the [payer]." '621 Patent, 10:14-19. The "shared secret" is presumably only known by the secure server and the payer, and therefore by entering the correct shared secret, the secure server verifies that it is in fact the payer trying to make the financial transaction. In other words, the secure server authenticates the payer by verifying the identity of the payer through the use of a shared secret. This intrinsic evidence supports M&A's construction.

The Special Master is not persuaded by Autoscribe's arguments. To begin, it is not clear how Autoscribe's proposed construction of "verifying the *legitimacy* of a payee" is different from verifying the *identity* of the payee. Based on the examples of authentication methods provided by Autoscribe at oral argument (an assigned access key, password, a coded token, or other data), it seems that the definition overlaps completely. Each of these forms of authentication verifies that the payee is who they say they are, as presumably the payee is the only entity in possession of

the assigned access key, password, or coded token. And whether a payee is *legitimate* seems to depend solely on their *identity*.

As for Autoscribe's argument that a described embodiment (authentication step 578 of FIG. 4f) would be read out if "authentication" was limited to identity verification, the Special Master disagrees. The embodiment described in FIG. 4f includes a step that "authenticates the system user" – step 576. '621 Patent, 13:63-64. The authentication step "may" access the "organization, application, and user key registry" – but that also means it may not. But even if the embodiment required accessing this "organization, application, and user key registry," nowhere does the patent explain that this registry is for determining authorization, as compared to being used to verify identity. Per Autoscribe, "we are looking at comparing keys." Claim Construction Tr., 84:11-12. Comparing the key provided by the payee with a registry of keys known to the secure server could verify the identity of the payee. The secure server cross-references the key provided by the payee with its key registry and determines if they match. If they do, the payee's identity is verified. If they do not, then the identity is not verified, and the API determines the request is not authentic at step 582. '621 Patent, 13:65-67. Further, Autoscribe admits that the authentication step in the cited embodiment includes "identity verification in the authentication process." ECF 140 at 16 ("the authentication steps 578 (FIG. 4f) includes a comparison of identity to the 'organization, application, and user key

registry' to do more than verify the identity of the user, but ***also*** to determine whether that particular user has authority to access the system.") (emphasis added). Therefore, even if the embodiment does in fact determine whether the payee is authorized – in addition to verifying the payee's identity – the embodiment is not read out by M&A's proposed construction. *See Vulcan Eng'g Co. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1375 (Fed. Cir. 2002) ("It is irrelevant whether an element has capabilities in addition to that stated in the claim.").

Regarding Autoscribe's argument that M&A's position in a parallel IPR lines up with Autoscribe's proposed construction, the Special Master disagrees. First, even if M&A took a different position in the IPR, Autoscribe has cited no authority that states that a position taken in an IPR that is never instituted, much less receives a final written decision, estops M&A from taking a different position in this proceeding. Second, M&A's position in the IPR does not necessarily conflict with its claim construction position here. Autoscribe cites the following from the IPR: to "use the PayPal API, [the merchant] must have API credentials that ***identify [it]*** as a PayPal Business account holder who is authorized to perform various API operations." *M&A Ventures v. Autoscribe*, No. IPR2024-01159, Paper 4 at 40 (PTAB July 18, 2024) (emphasis added); *see also*, ECF 140 at 16. So once again, the payee/merchant is identified. This is consistent with M&A's proposed construction.

Finally, M&A's construction does not render superfluous language in claim 15. The language at issue -- "the authentication credentials identifying the payee and authenticating the payee" – would become "identifying the payee and verifying the identity of the payee." Identification and verification of identification are two separate concepts. For example, the authentication credentials of Claim 15 would include the payee's identity (the name of the merchant) and the key assigned to the payee (which would be used by the secure server to verify that the merchant is who they claim to be).

Accordingly, the Special Master recommends the terms "authenticate[s] a payee" and "authenticating the payee" be construed as "verify[ies] the identity of the payee/verifying the identity of the payee."

### 4. "function" (Claims 1, 8, 15, 23, and 25)

| Autoscribe's Proposed Construction | M&A's Proposed Construction | Special Master's Recommendation |
|---|---|---|
| Plain and ordinary meaning<br><br>*Alternatively*, "that which a component, device, or system is intended to do;" or<br><br>"Within a computer program, a small group of instructions which perform a given task" | "block of code that operates as a single logical unit"<br><br>*Alternatively*, "a piece of code that operates as a single logical unit." | "within a computer program, instructions that perform a task" |

M&A argues that "function" has a distinct meaning in the context of software development and computer engineering, and that the '621 Patent specification uses the term "function" consistently with that distinct meaning. ECF 139 at 21. M&A cites dictionaries in support of its proposed constructions. ECF 139-16; ECF 139-18. M&A further cites to a disclosed embodiment, arguing that one function (or subroutine) is executed and concluded before proceeding to the next function. Claim Construction Tr., 92:2-12 (citing '621 Patent, 14:60-62).

Autoscribe argues that no construction is necessary as the "function[s]" at issue are defined in the claims themselves. ECF 140 at 17. Moreover, the term is being used in its ordinary everyday meaning as something a person or business does. Claim Construction Tr., 95:3-5. Autoscribe argues there is no intrinsic evidence to support limiting the scope of the term "function" to a block or piece of code that "operates as a single logical unit." ECF 140 at 17. Autoscribe also points out that one of the dictionaries cited by M&A offers a different definition of "function" as the primary definition: "[t]hat which a component, circuit, device, piece of equipment, or system is intended to do." ECF 141 at 17 (quoting ECF 139-16 at 5). Autoscribe also argues that M&A's proposed construction will cause line drawing issues, as it is not clear what constitutes a "block" or "piece" of code within a single

logical unit. Claim Construction Tr., 97:3-19. Finally, Autoscribe argues that M&A

took a contradictory position in the parallel IPR proceeding.[4]

The Special Master agrees that "function" should be given its plain and

ordinary meaning. Because the parties disagree as to the plain and ordinary meaning,

the Special Master finds some construction is appropriate to assist the finder of fact.

We start by looking at the claim language itself. *Phillips*, 415 F.3d at 1314. In

each of the relevant claims (Claims 1, 8, 15, 23, 25), the claims themselves define

what each of the functions are. For example, in Claim 1, the "token retrieval

function" is defined as:

> providing a non-sensitive electronic data token representing the
> sensitive financial account information to the merchant server
> without providing the sensitive financial account information to
> the merchant server and without providing the non-sensitive
> electronic data token to the payer; and

> processing the payment transaction using the sensitive financial
> account information by generating and transmitting an
> electronic request requesting the payment amount from the
> financial account, obtaining the payment amount, and
> forwarding at least a portion of the payment amount to the
> payee.

'621 Patent, Claim 1. Therefore, a POSITA would understand that the recited

"function[s]" refer to the performed steps recited in the claims.

---

[4] As explained above, Autoscribe cited no authority, nor did they directly argue, that
M&A must be bound by any alleged arguments or positions made in the parallel
IPR.

As to whether a POSITA would understand that this must be a single piece or block of code, nothing in the claims themselves suggests that. Neither does the specification. The specification makes no mention of computer or programming code – the only mentions of "codes" are security codes and confirmation codes. Further, the specification states that

> those skilled in the art will appreciate that computing processes may be divided between computers in a network in any desired manner, and that any number of computers may be used to perform a set of processing steps as is known in the art. Therefore, in this example the inventors have described the process in terms of a relatively simple exchange of data and instructions between two servers, but anticipate that in practice, these **functions may be performed** in some cases by a single computing system, and in other cases **by a plurality of computing devices with the tasks divided between the computers in any desired manner**.

'621 Patent, 8:61-9:5 (emphasis added). The specification further states that:

> Those skilled in the art will appreciate that the flow charts provided herein are only one example implementation; **functions may be reassigned as desired among the functional parts and locations of the system while remaining within the spirit of the invention**.

*Id.*, 11:43-47 (emphasis added). These references to functions being divided among multiple computing devices or systems indicate that a function need not be a single block or piece of code, but instead can be multiple blocks of code.

As intrinsic evidence is given greater weight than extrinsic evidence, the cited dictionary definitions are worth little consideration in construing "function." Yet,

they serve as a useful source for language to aid the fact finder in their consideration of the accused product and whether it meets the "function" claim terms. The dictionary definition that most closely aligns the definition provided by the Wiley Electrical and Electronics Engineering Dictionary: "[w]ithin a computer program, a small group of instructions which perform a given task." ECF 139-16 at 5. But as the '621 Patent does not include any indication that the functions must be limited to a "small group" of instructions, the Special Master recommends omitting that portion.

Accordingly, the Special Master recommends the term "function" be construed as "within a computer program, instructions that perform a task."

### 5. "perform[ing] each software process required to maintain compliance with one or more information security standards" (Claims 1, 8, and 25)

| Autoscribe's Proposed Construction | M&A's Proposed Construction | Special Master's Recommendation |
|---|---|---|
| Not indefinite;<br><br>Plain and ordinary meaning | Indefinite | Not indefinite;<br><br>Plain and ordinary meaning |

The only dispute here is whether "information security standards" renders the claims indefinite. M&A argues it does, as the term was not clearly defined in the intrinsic record, and it "was not a term of art in 2012—the earliest priority date to which the '621 Patent could be entitled." ECF 139 at 9-10. Moreover, the

specification uses multiple seemingly related phrases which M&A argues further confuses the issue. *Id*. at 11. And although M&A admits that a POSITA would have known that PCI DSS falls within the claim scope, it argues that this is insufficient to provide a sufficiently definite boundary. *Id*.; Claim Construction Tr., 8:22-9:3. Thus, M&A argues a POSITA would not have understood whether a specific source of guidance would be an "information security standard" as claimed. M&A further offered an expert declaration in support of its argument that a POSITA would not understand the scope defined by the term "information security standard." Claim Construction Tr., 12:16-13:22; ECF 139-2 at 18-26.

Autoscribe cites specific portions of the specification that give context to the term "information security standards." Specifically, the specification details that the benefit of the invention is that the secure server uses more security measures to keep the financial account information safe, while the merchant server does not need to comply with those stringent security measures. ECF 140 at 21-22. Autoscribe argues that the example of PCI DSS provides a standard to measure the scope of the claim. *Id*. at 22.

To prevail on its indefiniteness argument, M&A bears the burden of establishing by clear and convincing evidence that the claim fails to inform with reasonable certainty a POSITA about the scope of the invention. *BASF Corp. v.*

*Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). M&A has not met its heightened burden.

The first issue is whether the single example of PCI DSS as an information security standard is sufficient to define the scope of the term with reasonable certainty. The Special Master finds that it is sufficient. The Federal Circuit has held that examples within the specification, when accompanied by sufficient detail, can render a claim definite. *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1349 (Fed. Cir. 2022) (citing *Sonix Tech.*, 844 F.3d 1370; *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1335 (Fed. Cir. 2010)). The context of the '621 Patent is clear: the purpose of the invention is to allow merchants to offload the heightened security requirements required for handling certain financial account information (such as credit card information) to a third party through an improved tokenization method. '621 Patent, 1:34-2:7. Within that context, the specification discloses PCI DSS as "an information security standard" specific to the handling of "cardholder information for the major debit, credit, prepaid, e-purse, ATM, and POS cards." *Id*., 1:30-33. Further, the specification identifies that the standard was created by the "Payment Card Industry Security Standards Council." *Id*., 1:34-35. Further, a POSITA would be familiar with eCommerce and, more specifically, PCI DSS. ECF 139-2, ¶ 42. Based on the above, a POSITA would understand that "information security standards" would include any standards or requirements set out by a

standard-setting organization regarding securing information – more specifically, standards that apply to sensitive financial account information.

M&A cites *Interval Licensing* in support of its argument that a single example is insufficient. ECF 139, 11. This case is distinguishable. In *Interval Licensing*, the claim language at issue was "unobtrusive manner" – language that is "facially subjective." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1373 (Fed. Cir. 2014). With only a single example of what constituted "unobtrusive manner" – "e.g., the information is presented in areas of a display screen that are not used by displayed information associated with the primary interaction with the apparatus" – it would not be clear to a POSITA what else could be considered unobtrusive. *Id*. at 1373-74. For example, could the information be displayed in the same area as the primary interaction area, as long as its small enough? *Id*. at 1374. Here, "information security standard" is not a purely subjective term like "unobtrusive." Whether something is a security standard is not a matter of personal opinion. Rather, standards are set out by organizations such as the Payment Card Industry Security Standards Council. While there may be some ambiguity as to whether certain information security protocols or requirements set out by certain organizations qualify as "standards," absolute certainty as to the claim scope is not required. *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1372 (Fed. Cir. 2016) (collecting cases); *Nautilus*, 572 U.S. at 910.

Much of M&A's arguments are based, at least in part, on the testimony of M&A's expert Dr. Shamos. ECF 139 at 9 (citing ECF 139-2 at ¶¶ 50, 60-64). This sort of extrinsic evidence, which is generated at the time of and for the purpose of litigation, is less reliable than the intrinsic evidence. *Phillips*, 415 F.3d at 1318. For that reason, expert testimony should only be considered if the intrinsic evidence leaves the claim scope uncertain. As detailed above, the intrinsic evidence is sufficient to define the scope of "information security standard," therefore the Special Master considered but did not rely on the testimony of Dr. Shamos.

Moreover, Dr. Shamos's testimony is of questionable value. Dr. Shamos states that the term was not a term of art because "information security" was "dynamic" in the payment industry and that a POSITA would be unable to determine what would be within scope because there were multiple organizations providing information on securing cardholder data and multiple government bodies passing relevant legislation. ECF 139-2 at ¶¶ 60-64. Dr. Shamos provides no support for his opinion that the existence of multiple sources of information security requirements would prevent a POSITA from understanding what is and is not a "standard." Nor does he explain why a POSITA would not consider all of these to be "information security standards" within the scope and context of the '621 Patent, or why a POSITA would not understand the difference between a law (passed by a legislative

body) and a standard (promulgated by a non-legislative body). Thus, Dr. Shamos's conclusory opinions are of limited value. *Phillips*, 415 F.3d at 1318.

Accordingly, the Special Master recommends that the term have its plain and ordinary meaning without need for further construction.

### 6. "a representation of the non-sensitive electronic data token" (Claims 2, 9, 15, and 23) and "wherein the representation of the non-sensitive electronic data token is the non-sensitive electronic data token" (Claims 3, 10, and 16)

| Autoscribe's Proposed Construction | M&A's Proposed Construction | Special Master's Recommendation |
| --- | --- | --- |
| Not indefinite;<br><br>Plain and ordinary meaning | Indefinite | Not indefinite;<br><br>Plain and ordinary meaning |

M&A argues that these two claim terms cannot be understood consistently by a POSITA. Specifically, M&A argues that a "representation" of something must be different from that thing only or that thing only. ECF 139 at 32. It cites the specification – which uses "representation" in reference to a token being a representation of financial account information (e.g., credit card data) – and dictionary definitions for support. *Id*. at 33. Therefore, M&A contends, a POSITA could not determine whether "representation of the non-sensitive electronic data token" is the token itself or something else. And if "representation of the … token" must be something other than the token, this conflicts with the second claim term, where the representation is the token itself. M&A argues a POSITA would be unable

36

to pick between two different definitions of "representation" rendering the claim invalid. *Id.* at 36.

Autoscribe argues that a POSITA would understand "representation" as both the token itself and a stand-in for the token. ECF 140 at 24-26. Autoscribe points to dictionary definitions that do not expressly require that a representation represent something else. *Id*. at 26. Moreover, Autoscribe argues that the '621 Patent discloses the use of both representations of tokens (such as a payer ID or account number) or the token itself in completing transactions. ECF 141 at 30-31. Autoscribe also argues that "self-representation" is a well-known concept, giving the example that writing "5" on a page represents the number 5, but that "5" is also the number 5 itself. *Id*. at 33.

M&A bears the burden of proving indefiniteness by clear and convincing evidence. *BASF*, 875 F.3d at 1365. Though neither party requested a specific construction of "representation," resolution of the indefiniteness argument depends on its scope. Autoscribe asserts there is no indefiniteness because the scope of "representation" includes **both** the token and something other than the token. M&A's argument is predicated on the scope of "representation" being limited to one or the other only. The Special Master agrees with Autoscribe's scope of "representation" and, therefore, does not find clear and convincing evidence of indefiniteness.

Based on the plain and ordinary meaning of "representation" in the context of the '621 Patent's specification, a POSITA would find that a "representation" could include either the token itself or a representation different than the token. Autoscribe submitted persuasive evidence that the ordinary definition of "representation" includes both the thing represented and a stand-in for that thing. ECF 141 at 33. And as both parties agree, the '621 Patent specification uses "representation" in both contexts. ECF 139 at 33-36; ECF 141 at 30-32. Contrary to M&A assertions, there is nothing in the intrinsic evidence that mandates that the "representation" be something other than the token, thus creating a conflict.

Dependent claims confirm rather than cut against this construction of "representation." M&A contends that a POSITA would not understand how to differentiate the respective claims using the "representation" claim terms. The Special Master disagrees. Claims 2, 9, 15, and 23 use the plain and ordinary meaning of "representation" as discussed above. Whereas the other claims narrow the scope of "representation" to either the token itself or a symbolic representation. Using additional claim language to narrow the scope of a term does not create ambiguity or inconsistency.

The Special Master finds M&A's reliance on *HZNP Medicines* unpersuasive. ECF 139 at 36. In that case, the term construed was "better drying time." *HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 696-98 (Fed. Cir. 2019). Cited

evidence indicated that both slower drying time and faster drying time were the "better" drying time. *Id.* It is the adjective "better" that created inconsistency in that case. "Better" requires a choice between either slower or faster drying time. There is no such requirement with "representation." Therefore, this case is distinguishable from *HZNP Medicines.*

The Special Master acknowledges the expert testimony but finds it unpersuasive. In the context of patent claim construction, expert testimony can suffer from bias that is not present in the intrinsic evidence and should be discounted if clearly at odds with the written record of the patent. *See Phillips*, 415 F.3d at 1318; *see also Vitronics*, 90 F.3d at 1584 ("[W]here the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight."). Here, Dr. Shamos's opinion, like M&A's argument, is predicated on the assumption that the scope of "representation" must be **either** the token itself or something other than the token, but not both. ECF 139-2 at ¶¶ 75-84. But this assumption is not supported by evidence, only conclusory statements. Dr. Shamos's discussion of the plain and ordinary meaning of "representation," specification, and claim differentiation mirrors M&A's own legal arguments. Simply having an expert reiterate an argument does not give it additional weight.

M&A has not established by clear and convincing evidence that the "representation" terms renders their claims indefinite. Accordingly, the Special

Master rejects M&A's indefiniteness argument and recommends that the terms have its plain and ordinary meaning without need for further construction.

## VII.    CONCLUSION

The Special Master recommends the Court issue an order construing the following terms of the '621 Patent as stated in the table below.

| TERM | RECOMMENDED CONSTRUCTION |
|---|---|
| "sensitive financial account information" (Claims 1, 8, 15, 23, 25, and other dependent claims) | Not indefinite;<br><br>Plain and ordinary meaning |
| "obtain[ing] the [second] payment amount" and "forward[ing] at least a portion of the [second] payment amount" (Claims 1, 2, 8, 9, 15, 23, and 25) | "obtain[ing] the money required for the [second] payment" and "forward[ing] at least a portion of the money required for the [second] payment" |
| "authenticate[s] a payee" and "authenticating the payee" (Claims 1, 8, 15, 23, and 25) | "verify[ies] the identity of the payee/verifying the identity of the payee" |
| "function" (Claims 1, 8, 15, 23, and 25) | "within a computer program, instructions that perform a task" |
| "perform[ing] each software process required to maintain compliance with one or more information security standards" (Claims 1, 8, and 25) | Not indefinite;<br><br>Plain and ordinary meaning; |
| "a representation of the non-sensitive electronic data token" (Claims 2, 9, 15, and 23) | Not indefinite;<br><br>Plain and ordinary meaning |

| TERM | RECOMMENDED CONSTRUCTION |
|---|---|
| "wherein the representation of the non-sensitive electronic data token is the non-sensitive electronic data token" (Claims 3, 10, and 16) | Not indefinite;<br><br>Plain and ordinary meaning |

Respectfully submitted, this 23rd day of April, 2025.

/s/ *William B. Dyer III*

William B. Dyer III, Special Master
GA Bar No. 236915
LEE & HAYES, P.C.
75 14th Street NE, Suite 2500
Atlanta, GA 30309
Telephone: (404) 815-1900
Facsimile: (404) 815-1700
Email: bill.dyer@leehayes.com
